498

## SERVICE STATION EQUIPMENT CO. v. AIR SCALE CO.

### No. 7428.

Circuit Court of Appeals, Sixth Circuit.

Dec. 6, 1938.

Frank E. Paige, of Philadelphia, Pa. (Owen & Owen, of Toledo, Ohio, Paige & Paige, Frank E. Paige, and Arthur E. Paige, all of Philadelphia, Pa., and Wilbur Owen and Scott H. Lilly, both of Toledo, Ohio, on the brief), for appellant.

Wm. O. Ballard, of Toledo, Ohio (Wm. O. Ballard, of Toledo, Ohio, on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

HICKS, Circuit Judge.

Suit by appellant, assignee, against The Air Scale Company, appellee, for infringement of Reissue Patent No. 19,148, issued April 24, 1934, to Woodford. The defenses were: That the patent was inoperative; that it did not represent invention; that Woodford had conceded priority to another; and non-infringement.

The District Court dismissed the bill, holding: (1) That the reissue was invalid because the affidavit upon which the application therefor was prosecuted was insufficient and because appellant unreasonably delayed his application therefor; (2) that Claim 1, which was identical with the sole claim of the original patent, was invalid on the ground that it was inoperative and functional. It ruled further that the claim was not infringed.

The Reissue Patent, like the original, is for an "Apparatus For Supplying Air Under Pressure." In addition to Claim 1 there are ten other claims.

Claim 1 and Claim 7, a method claim, are set out in the margin.[1]

In our view of the case we may assume, without deciding, that the reissue patent is valid. It relates to a method and mechanism for inflating pneumatic tires, more particularly for feeding charges of air from a high pressure container into automobile tires and automatically arresting the inflow as soon as a selectively predetermined pressure is reached therein. The high pressure source to which the device is connected is ordinarily a tank carrying a pressure of from 90 to 150 pounds. The "tire flator" has a dispensing hose, the outer end of which is provided with a chuck valve. When the valve is applied to the valve stem of a tire, and assuming the pressure in the tire to be below the

[1] "1. In a device for charging a receiver with compressed air, the combination of a source of compressed air, adjustable means for limiting the ultimate pressure to which said receiver is to be charged, a conduit connecting the source of compressed air with the receiver, a valve in said conduit, means tending to close said valve, means opening said valve when the pressure in the conduit falls to that at which the device is adjusted, and means timing the open interval of said valve, whereby said valve intermittently opens, dwells in open position, and closes, this cycle continuing until pressure in the receiver reaches that to which the device is adjusted.

* * * * * *

"7. The method of filling a tire to a predetermined limit of pressure, which consists in delivering through a passage to the tire a succession of charges of compressed air, at least the major portion of each charge being delivered to the tire at a pressure substantially higher than said limit and the successive charge being introduced before the pressure falls materially below said limit, and utilizing pressure of air in said passage to automatically stop the delivery of charges to the passage when the pressure in the tire reaches said limit."

pressure for which the tire flator is set, it inflates the tire in a series, or succession, of surges of compressed air. Woodford claims that his device and method materially reduce the time theretofore required for inflation.

It is important to determine the effect to be given the word "means" used as elements in the Woodford combination claims. The drawings, specifications and claims of Woodford's original patent No. 1,655,003, January 3, 1928, and the reissue disclose that the sensitive medium causing the cutting on of the feed valve, and initiating its closure, was a diaphragm installed between a hand-adjusted spring which engaged it on the left, and an air chamber connected with the high pressure container on the right. The hose, used to feed the tire, branched from a pipe which fed the chamber. When the feed hose was not being used, the pressure in the chamber was probably greater than that from the spring so that the diaphragm was compressed to the left against the spring which was adjustable by hand to any pressure desired in the tire.

The chuck valve at the end of the feed hose opened when applied to a tire, and the pressure dropped in the supply pipe and in the air chamber, with the result that the diaphragm responded to the pressure from the spring, moving to the right. This movement caused a projection thereon to engage a second metallic projection, thereby closing an electrical circuit which energized a relay, whose armature switch then closed and energized a magnet whose armature opened the feed valve from the high pressure container.

The air under pressure rushed through the feed valve, into the connecting pipe, into the tire, and also into the air chamber to the right of the diaphragm, which, when the pressure became great enough, was pushed to the left to open the electrical circuit and deenergize the relay.

But means were provided (and this is important) to retard the release of the solenoid core of the relay, and thus delay the opening of the circuit of the magnet operating the feed valve. The effect of this delay was to permit the high pressure air to continue to rush into the piping and tire for a time, even after the pressure in the piping exceeded that desired in the tire, as established by the spring to the left of the diaphragm, and to inflate the tire more quickly and with fewer charges.

The delay we have spoken of was effected by the construction of the relay, the magnet portion of which was in the form of the solenoid mentioned, having the iron core, which moved between a spring at one end and a dash pot filled with oil at the other. When the relay was energized the solenoid moved upward against the pressure of the spring and an enlargement on the solenoid came in contact with a brush, thus energizing the magnet opening the feed valve. The solenoid remained in that position as long as the circuit, controlled by the diaphragm, remained closed. As soon as it opened the relay was deenergized and the pressure of the spring operated to move the solenoid downward, ultimately breaking the contact between the enlargement and brush, which would deenergize the magnet which held open the feed valve against the pressure of the spring. But the downward movement of the solenoid core was retarded by the operation of the dash pot at its other end, and this delay, as stated in the specification, was "sufficient to permit an appreciable amount of air to be fed into the tire."

When the feed valve finally closed, the tire, if not fully inflated, absorbed the excess pressure in the piping, the pressure dropped in the air chamber, the diaphragm moved back to the right, closed the circuit, and the whole process was repeated, resulting in the delivery of another charge of air into the piping and tire.

Again quoting from the specifications, —"These operations are repeated until sufficient air is accumulated within the tire, whereupon the diaphragm * * * is again and finally pressed to the left by the air that is then under sufficient pressure to maintain the diaphragm in this position, when the outlet valve 'to the tire' is closed. * * *"

Woodford taught that if there were no retardation, the pressure, built up almost instantaneously in the air chamber, would move the diaphragm to the left, break the circuit, deenergize the relay, and close the feed valve almost as soon as it opened, and that the inflation would require a great number of charges, since each being so small would constitute but the tiniest fraction of the deficiency of poundage to be made up in the ordinary inflation operation.

Appellant claims that its Woodford Reissue patent which took the date of the original Woodford patent, namely, January

3, 1928, was infringed by appellee who manufactured under Morley Patent No. 1,-632, 618, and particularly under the second Morley patent issued November 19, 1929.

The feed pipe of the first Morley patent, as shown in the drawing Fig. 2, led into a small air chamber to the right of two perpendicularly mounted diaphragms, the left one of which was slightly larger. The hose to the tire led from this chamber. By moving to the right the diaphragms closed the feed valve, and, to the left, opened it.

The mechanism for achieving the desired pressure in the tire consisted of a horizontal beam with fulcrum at the left and graduations marked thereon, and a weight which could be moved along the beam to any desired point. To the right of the fulcrum was a notch in the lower edge of the beam which engaged a pin attached to the center of a horizontally mounted diaphragm. This diaphragm had an air chamber beneath it which was connected by a small passageway with the first air chamber. When the air pressure beneath the horizontal diaphragm became greater than the weight of the beam pressing down on it, it. moved upwardly, opening a valve leading to a third chamber to the left of the perpendicular diaphragms. The larger of these two diaphragms was pierced by a small hole which allowed the air to leak into the space between the two diaphragms, and then by a passageway to the outside.

When the feed valve opened, the air rushed into the first chamber and some of it of course passed down the hose line to the tire. Some found its way through the small passageway to the second chamber. When the pressure therein built up sufficiently, the diaphragm moved upwardly against the weight of the beam and opened the valve leading to the third chamber and allowed the air to rush therein and press against the larger of the two diaphragms. The pressure thereon was greater than the pressure on the smaller one from the first chamber and the two diaphragms were pushed to the right, closing the feed valve. As the pressure went down in the first chamber through absorption from the tire, it also drained out of the second chamber and the weight of the beam pressed the horizontal diaphragm downward to close the valve to the third chamber. The air leaked gradually from the third chamber through the hole in the large diaphragm and thence through the passageway to the outside, and when the pressure therein became less than the back pressure from the tire, the diaphragms moved to the left, opening the feed valve for another charge.

The principal feature of the second patent to Morley is the provision of a means for promptly draining the air out of the third chamber after the tire had exhausted the high pressure in the first. As stated, in Morley's first device, the pressure in the third chamber was gradually dissipated through a hole in the larger diaphragm. As a result there was some delay before the pressure was taken off the larger of the two diaphragms, allowing the feed valve to open. The means added in the second patent was a passageway provided to tap the third chamber and connect with a spring-closed bleed valve located just below the scale beam. When the pressure dropped in the second chamber the beam dropped, engaging a projecting stem on the bleed valve, forcing the valve open by its weight, and causing the pressure to be drained quickly from the third chamber, thus quickly reducing the pressure on the larger diaphragm and speeding the opening of the feed valve. This bleed valve closed as soon as the pressure had built up sufficiently in the second chamber to raise the diaphragm and lift the beam on the projecting stem.

We have gone into some detail in setting forth the Woodford and Morley devices and methods, because, appellant claimed the Woodford improvements consisted essentially "of opening the valve promptly upon pressure falling to a predetermined limit with the relatively new idea of maintaining the valve open for a sufficient length of time so as to insure a series of surges of high pressure air. * * *" Granted that Woodford and Morley achieved the same result, we think that there was no infringement because they went about it by such diverse means and methods,—there is no substantial similarity in their devices or methods. See Royer v. Coupe, 146 U.S. 524, 531, 13 S. Ct. 166, 36 L.Ed. 1073. We agree with the holding of the District Court that the "disclosure of Woodford's patent shows that he claims to have invented an almost purely electrical device," while that of Morley was pneumatic. The delay in Woodford is effected by "means" of a dash pot operating on a solenoid core; that of Morley by restricting openings and air passages. In Woodford the feed valve opening is instigated by direct pressure of the gauging device on the diaphragm; in Morley by a

complex system of air control originating in the weight of a scale beam.

There is no basis for the doctrine of mechanical equivalents. However broadly Woodford's claims might be read as to variant electrical devices or even closely analogous pneumatic and mechanical arrangement, we can not make them cover Morley's construction or method. Heidbrink v. McKesson, 6 Cir., 290 F. 665, 670; O. H. Jewell Filter Co. v. Jackson, 8 Cir., 140 F. 340, 344, 346; Ford Motor Co. v. Gordon Form Lathe Co., 6 Cir., 87 F.2d 390, 392.

The decree dismissing the bill is affirmed.

WEST, District Judge, took part in the conference but died before the opinion was prepared.