## MERCO NORDSTROM VALVE CO. v. W. M. ACKER ORGANIZATION, Inc., et al.

No. 8997.

Circuit Court of Appeals, Sixth Circuit.

Oct. 10, 1942.

Rehearing Denied Dec. 10, 1942.

F. O. Richey, of Cleveland, Ohio (F. O. Richey, of Cleveland, Ohio, William A. Strauch, of Washington, D. C., Lewis D. Konigsford, of Pittsburgh, Pa., Strauch & Hoffman, of Washington, D. C., and Richey & Watts, of Cleveland, Ohio, on the brief), for appellant.

Hugh M. Morris, of Wilmington, Del., (Hugh M. Morris, of Wilmington, Del., Donald U. Rich, of New York City, Alexander L. Nichols, of Wilmington, Del., and Kwis, Hudson & Kent, of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

Suit by appellant for infringement of Claims 6, 7 and 8 of Reissue Patent No. 17,375, herein called No. 75, July 16, 1929, to Nordstrom for a "Valve"; and of Claims 13 and 14 of Patent No. 2,012,578, herein called No. 78, August 27, 1935, also to Nordstrom for a "Valve." The defenses were invalidity and noninfringement.

In its findings of fact and conclusions of law, the court limited the claims substantially to the disclosures of the patent, and held that so limited, they were valid but uninfringed. It thereupon dismissed the bill by a short, general decree. Plaintiff appealed. There was no cross appeal.

Appellant asserts that the only issue here is that of infringement since appellees have not filed a cross appeal. We do not so understand the law. The appeal brought up the whole case and appellees are entitled to an affirmance if it was right for any reason. Appellees are entitled to be heard upon the question of validity of the patents, regardless of the finding, and if the patents are invalid, the decree was right although based upon noninfringement. Stelos Co. v. Hosiery Motor-Mend Corp., 295 U.S. 237, 239, 55 S.Ct. 746, 79 L.Ed. 1414; Langnes v. Green, 282 U.S. 531, 538, 51 S.Ct. 243, 75 L.Ed. 520; Mills Nov. Co. v. Monarch Tool & Mfg. Co., 6 Cir., 49 F.2d 28, 29; Cleveland Clinic Foundation et al. v. Humphreys et al., 6 Cir., 97 F.2d 849, 855, 121 A.L.R. 163.

Each patent relates to an improvement in the pressure lubricating system of "plug valves." No. 78 emphasizes its application to "tapered plugs."

In the specification of No. 75 it was stated that one object of the invention was "to provide a plug valve * * * with a system of lubricating grooves of such arrangement that when the plug is in closed position the grooves on each side of the passageway through the valve seat cooperate to constitute a continuous groove completely surrounding the passageway which may be filled with lubricant under pressure to prevent leakage past the plug." By the described arrangement it was stated that it was "possible to turn the plug through an angle of 360 degrees without exposing a groove or grooves in which there is lubricant under pressure to the fluid passing through the line." The specification indicates that the principle of pressure lubrication for the purpose of lubricating and rendering heavy valves nonleakable was already old, and that No. 75 proposed to apply that "principle" to plug valves of the "cheapest and lightest construction."

The drawings are illustrative of a tapered plug and the specification states that this is the preferred form. Five of the eight claims expressly called for a tapered valve seat, although the three claims in suit do not so specify. The valve described consisted of a tapered plug, frusto-conical in shape, seated with the small end down in a valve seat of the same shape. A threaded projection at the lower end of the plug received a rigid washer and nut, which when screwed tight held the plug securely against the seat. A flattened stem at the upper end of the plug accommodated a wrench for rotation into open and closed positions. The plug had a single passageway therethrough, the ports of which, when in registry with the passageways in the seat, allowed the flow of fluids and gases through the valve; and out of registry, blocked such flow.

In the prior art play between plug and seat permitted rotation of the plug and prevented binding; but fluids and gases in the line, often under tremendous pressures, tended to infiltrate through this space, either around, beneath, or over the plug, causing valve leakage. The purported invention of No. 75 was designed to close this space between plug and seat with a grease or lubricant under sufficient pressure to hold back the fluids or gases of the line, thus rendering the valve nonleakable. This was accomplished by the providing in the faces of the plug and of the seat a system of grooves which were in communication with a grease reservoir in the cone of the valve stem to which pressure could be applied by means of a screw in the stem. Two radial ducts, extending at right angles to the long axis of the plug and at 180 degrees to each other, connected the grease reservoir with the center of horizontal arcuate grooves in the plug face which grooves were disposed midway between each port and above its upper edge. Also in the face of the plug and disposed below the lower edges of the ports were two other arcuate horizontal grooves parallel to those just described. In the open and closed positions of the valve, the ends of each pair of parallel grooves were connected by vertical grooves, four in all, cut into the seat of the plug 90 degrees apart. Thus the lubricant spread from the reservoir through the two radial ducts to the centers of the upper arcuate grooves, thence to the ends thereof, and when in registry with the vertical grooves down those grooves to the ends of the lower arcuate grooves and into those grooves. In the open position of the plug only the vertical sides of each port were paralleled with lubricant filled grooves under pressure. But by rotating the valve into the closed position, each pair of horizontal grooves moved through 90 degrees into positions above and below the openings in the valve seat, the ends moving into registry with the ends of a pair of vertical groves forming a four-sided lubricant-filled groove system completely surrounding each line opening and in theory preventing the leakage of fluids and gas from the line around the plug to the other side. The primary blocking of the line fluid probably occurred at the lubricant-filled grooves, and the emphasis of the patent appears to be placed upon these continuous grooves. But it was expected that the grooves would be supported from the lubricant which had been smeared by rotation or squeezed by pressure into the areas of the plug adjoining the groove, since the specification expressly referred to a "seal of lubricant," indicating the lubrication process itself had sealing features. Between the full open and closed positions of the valve single vertical grooves on opposite sides of the valve seat would be exposed to line pressure. However, in this position the exposed vertical grooves would be out of communication with the reservoir and the only lubricant which would be swept into the line would be the relatively small amount then in each vertical groove. When the valve

rotated again into full open or closed position, these empty vertical grooves would again move into registry with the ends of the horizontal grooves and would again be pressed full of lubricant. In the intermediate position of the valve only one vertical groove on each side of the valve would be in communication with the lubricant chamber, and would lubricate that portion of the valve adjacent to it, while the other two vertical grooves were, as we have said, being emptied by line pressure.

In valves seldom used or set in lines through which corrosive liquids flowed, it sometimes happened that the plug would become so jammed into its seat that it could not be rotated by the usual means. This was particularly true of tapered valves. To meet this difficulty the practice devoloped of providing under the plug a chamber into which lubricant could be forced under heavy pressure, thereby hydraulically lifting or "jacking" the plug from its seat, loosening it. The process of jacking was old and one embodiment for achieving it is illustrated in Reissue No. 14,516 to Nordstrom dated August 27, 1918. It should be noted also that the later provision of the flexible washer in No. 75 permitted a modified form of jacking through the lifting effect of the lubricant under pressure in the grooves. And in the specification of No. 78 it was stated that that patent had particular application to valves "having tapered plugs...which employ compressed lubricant to hydraulically jack the plug from its seat."

Patent No. 78 was designed to combine an improved sealed port or cut off feature such as was described in No. 75 with the jacking feature and an improved means for preventing "leakage of line fluid between the stem and casing," this last by the provision of a sealing channel around the stem set in a shoulder of the plug and operating against an overhanging portion of the casing which was provided with a diaphragm and packing ring affording some resiliency against compression. All this was to be accomplished in one system of lubrication, and since jacking required quite high pressures, an equivalent pressure in the sealing channel around the stem would tend to neutralize the jacking pressure. It was hence an object of the invention to create a lag in the lubricant pressure exerted in the various sealing channels by reducing channels and openings between them and the jacking chamber where the highest pressure should be generated.

More specifically, No. 78 described a tapered plug with a lubricant reservoir in the core of the valve stem. This reservoir was connected by means of a large radial and vertical duct with the jacking or lubricant chamber at the base of the plug. The groove system in the seating surfaces of the valve, however, differed somewhat from that described in No. 75. There were two horizontal arcuate grooves in the face of the plug disposed midway between each opening of the passageway and above its upper edge as in No. 75. But there were no horizontal arcuate grooves parallel thereto below the level of the passageway either in the surface of the plug or in its seat, the jacking chamber apparently sufficing to seal the port beneath the passageway. There were two pairs of vertical grooves in the same general position as in No. 75 but they were cut into the surface of the plug and not into the seat as in No. 75. The vertical grooves terminated short of the jacking chamber but communicated therewith by means of four dwarf grooves in the seating face. One vertical groove of each pair directly joined the end of the horizontal arcuate groove; the other vertical groove of each pair terminated below it, but in the open or closed position of the valve, communicated with the other end of the horizontal groove by means of other dwarf grooves also cut into the surface of the seat. A small duct bored into the center of one of the upper arcuate grooves, communicated with the annular groove or sealing channel cut into the upper surface or shoulder of the plug and surrounding the stem; which annular groove engaged the overhanging gasket or diaphragm we have already referred to.

Thus, this valve provided, with the jacking chamber as one side, a four-sided seal around the passageway in closed position and an annular seal between stem and casing in the shoulder of the valve. No claim is made for the jacking feature which was admittedly old. Because the ducts from reservoir to jacking chamber were relatively large and the groove and duct channels between jacking chamber and annular seal in the shoulder of the plug were relatively small and quite tortuous, the pressure in the annular seal was made to lag behind that in the jacking chamber, and "For this reason fluid pressure sufficient to jack the

plug from its seat can be built up in chamber 59, without applying such fluid pressure to channel 71" (annular seal) "as might interfere with such jacking action." In most intermediate positions one of each pair of vertical grooves would be exposed to the line, but at such positions it would be disconnected from the sources of lubricant pressure as in No. 75.

## INVENTION.

■ No. 75. The court found that the claims in issue were valid. It further specifically found upon substantial evidence that appellant's construction had solved the problem of preventing leakage in flow lines and sticking of valves. The valve had commercial success and was accepted by the trade. Of course the patent itself was prima facie evidence of its validity. Appellee offered a number of prior usages and several patents as alleged anticipations but appellee's expert designated the Reading valve and the French patent to Schaar as the nearest references and we shall limit our discussion to these two, although we have examined the entire record. Grand Rapids Brass Co. v. Winters, Stryker & Crampton, 6 Cir., 15 F.2d 129.

The valves of the Homestead Valve Company (of which the Reading valve was a product) had no problem of preventing leakage. The Reading valve was a four-way tapered valve having four vertical grooves in the casing, so arranged that there was one on either side of each port. Grease, fed from the center of the stem, reached a chamber at the bottom of the plug by a vertical duct through the stem, and by a horizontal duct, an area above its shoulder which was cut in a cam for the purpose of putting pressure on the plug in its seat. Two very loosely fitting brass washers fitted over the cam-cut shoulder and any grease from the horizontal duct would have to move outwardly through and around these brass rings to the upper part of the plug. There were circumferential offsets at the edge of this shoulder and at the edge of the plug at the bottom. These offsets communicated with the vertical grooves in the plug by means of four dwarf grooves cut into the upper and lower edges of the seating face of the plug, tapping the circumferential offsets and so spaced that they could be brought into registry with the vertical grooves in the casing. The result was that in the open position each port was surrounded on four sides with a grease channel; and during the rotation of the valve, when they would be exposed to the washing effect of the fluid in the line, the grease grooves in the casing were out of registry with the grease source.

However, the grooving in the Reading valve was roughly done, in one exhibit crudely, and the camming action was such that the pressure was taken off the lubricant in the open position of the valve. We are unable to see therein the No. 75 operation, even if the circumferential offset were otherwise tight enough to stand comparison with the upper arcuate grooves of No. 75.

The Reading valve was designed to be held tightly in its seat by camming pressure and the system of grooves and offsets was cut for purposes of lubrication and was incapable of maintaining a frame of pressure lubrication around ports in the open and closed positions. Its construction is in no sense an anticipation of or a seriously limiting influence upon No. 75.

The same must be said of the patent to Schaar, French Patent No. 461,305. This patent was in a non-analogous art. Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., 6 Cir., 111 F.2d 239, 241. It was for a rotary distributor in an internal combustion engine in which the combustible charge entered through one stem of the plug, the exhaust passing out through the other. Lubrication was by oil under pressure, and the excessive oil drained out into the crankcase. This was a pure lubricating system, in which the series of grooves in the casing and plug were designed to keep the oil out of the distributor and exhaust. It was not designed to withstand line pressure and is not anticipatory.

■ We think Patent No. 75 connotes invention and warrants a fair range of equivalency. Paper Bag Patent Case (Continental Paper Bag Co. v. Eastern Paper Bag Co.), 210 U.S. 405, 415, 28 S. Ct. 748, 52 L.Ed. 1122; National Battery Co. v. Richardson Co., 6 Cir., 63 F.2d 289, 293.

No. 78. Appellee's expert considered that the Canton valve of the Homestead Valve Company and the patent to Milliken, No. 1,696,723, December 25, 1928, represented the best in the prior art. The Canton valve, of tapered plug design with three ports, disclosed circumferential grooves in the valve body or casing, one near the top of the plug and the other near the bottom. The plug itself had four vertical grooves

so positioned that each passageway was framed above and below by horizontal grooves and on each side by vertical grooves. The expert testified that there was an annular ring in the shoulder of the plug, although it is not obvious to us in the exhibits. It does not appear whether the plug of this valve was held tightly in its seat by camming action, but the expert testified that it did not have the cut off feature except in the fully opened and closed position, not in the partially open position when the vertical grooves are exposed to line flow. Lubrication was by alemite fittings.

The Milliken (Reissued) described both a tapered and a cylindrical plug valve, in which the lubricant was fed into a chamber beneath the valve from a reservoir made integral with and down one side of the casing. The lubricant then spread upwards through grooves cut in the casing to a peripheral channel at the top of the plug. The casing at this part of the valve was constructed with an overhanging portion which engaged the shoulder part of the plug. The channel was notched into the shoulder at its periphery and beneath the overhanging portion. In the tapered plug type a washer was interposed between overhang and shoulder. Although there was a grease chamber at the bottom it was expressly stated in the specification that there was no jacking in either form of the valve, and it would seem susceptible to an S leak in closed position and without the cut off feature in the partially closed position. Unlike No. 78, this assembly appeared to have only two vertical grooves and did not have the arcuate horizontal grooves in the upper face of the plug.

Neither of these structures had a four-sided groove arrangement and both were minus the improved cut off feature. Milliken had the peripheral channel in the plug shoulder but lacking the jacking feature had no arrangement for bringing pressure thereon and did not have the retarding devices of No. 78 whereby the seal could be provided between shoulder and overhang by pressure from the base of the plug. We think No. 78 represented an inventive step forward in the art.

## INFRINGEMENT.

We copy Claims 6 and 7 [1] of No. 75.

Claim 6 calls for longitudinal and transverse grooves in the seating surface of the valve forming in open and closed position of the valve two diametrically opposed "closed circuit grooves." Claim 7 calls for the continuous closed feature plus cut off when the grooves are exposed to line pressure.

The accused valve was constructed as follows: It had a cylindrical, rather than the tapered plugs of the two valves at issue. On the face of the plug and near its top and above the ports of the passageway therethrough was a horizontal groove completely encircling the plug; and parallel to this groove and below the ports was a second groove also circumferential in its extent. There were vertical grooves cut into the plug on either side of the port. One groove of each pair connected with each horizontal groove; and the other of each pair terminated slightly above the lower horizontal groove, having no grooved connection therewith, while the upper end terminated slightly beneath the upper horizontal groove, being connected therewith by a short and insignificant scratch groove.

---

1 "6. A valve comprising, a casing having a passageway therethrough and a valve seat formed transversely of the passageway, a plug seated in the valve seat and having a hole adapted to register with the passageway, longitudinal and transverse grooves in the seating surface of the valve arranged to form when the plug is in its open and closed positions two diametrically opposed closed circuit grooves, a reservoir for containing plastic substance, connections between the reservoir and all the grooves when the plug is in its substantially full open and closed positions only, and means for putting the plastic substance under pressure.

"7. A valve comprising, a casing having a passageway therethrough and a valve seat formed transversely of the passageway, a plug seated in the valve seat and having a hole adapted to register with the passageway, longitudinal and transverse grooves in the seating surface of the valve arranged to form a continuous groove surrounding the passageway when the plug is in closed position, and means for introducing a plastic substance under pressure into the grooves, the longitudinal grooves being so arranged that they are only supplied with lubricant under pressure when they are not exposed to the fluid passing through the valve, but are cut off from the supply of lubricant under pressure when they are exposed to the fluid passing through the valve."

282

In the open and closed positions of the valve these gaps between the shortened vertical grooves and the upper horizontal groove were bridged by dwarf grooves cut into the face of the casing. This valve was designed to rotate through 90 degrees only, and when the shortened vertical grooves were exposed to the fluid in the line, they were, except for the scratch grooves, disconnected from either of the horizontal grooves, the upper horizontal groove of which was connected to the grease reservoir in the stem by means of radial ducts through the plug. The lubricant seal thus spread into the system from the reservoir by means of the radial ducts through the plugs connecting with the upper horizontal groove. The grease spread therefrom at all times down the full length vertical grooves to and into the lower horizontal circumferential grooves and at full open and closed positions down the shortened grooves because of registry with the dwarf grooves. Out of registry, some grease was pressed into the two scratch grooves but appellee claimed that leakage thereby into the line was inconsequential and that the scratch grooves were provided to lubricate the area around the upper part of the groove when it was out of registry with the dwarf grooves. These vertical grooves, it was said, were not joined to the lower horizontal groove because of the low grease pressure in that part of the system, and because line pressure would at that point be more potent in washing it out.

In the horizontal upper shoulder of the plug and connected with the grease reservoir by short vertical ducts from the radial ducts in one model of the accused valve, and in another by extensions of the long vertical grooves in the face of the plug, was an annular groove which when filled with grease pressed against an overhang above and prevented leakage around the stem.

The plug was flexibly secured at the bottom by means of a spring interposed between the cylindrical plug and a threaded plug screwed into the bottom of the casing. This spring of course caused the plug to press against the overhang and assisted in the annular seal at that point.

We think appellee's circumferential horizontal grooves with the two complete vertical grooves and the two shortened ones serving substantially to frame the ports of full open and closed position with lubricant under pressure are the full equivalent of appellant's structure. It is stressed that one of each pair of appellee's grooves does not connect with the lower horizontal groove. We regard this as an immaterial variation. The groove system of No. 75 was designed to be supported by the grease that spread out between plug and casing as lubrication, and the ungrooved area in the four-sided frame in appellee's valve was inconsequential since it would be sealed by the spreading lubricant. The scratch groove at the upper end may have aided in the process of lubrication but it was so tiny that in a test before the district judge he stated that he was unable to see any continuous extrusion therefrom when a groove was in the position of exposure to line fluid. We cannot but find that the cut off was complete and that the accused valve not only had the substantial equivalent of the continuous or closed groove system of Claims 6 and 7 but also the cut off feature of 7 and that the departures we have described are "merely colorable." E. H. Bardes Range & Foundry Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, 698. The resemblance is "quite as close as is usually made by those who attempt to evade a patent whilst they seek to use the substance of the invention." Ives et al. v. Hamilton, Ex'r, 92 U.S. 426, 431, 23 L.Ed. 494. It is immaterial that the accused valve was cylindrical rather than tapered and that it rotated but 90 degrees rather than 360 degrees. The claims in issue are not limited to any particular kind of valve. The systems both of the patent and the accused device were the same.

From repeated readings of Claim 8 in the light of the specifications and drawings, we are unable to visualize with certainty the structure claimed. We think that this claim is invalid for indefiniteness.

We also think that Claims 13 and 14 of No. 78 are infringed. We copy Claim 14,[2] which is identical with 13, except that in

[2] "14. In a plug valve, a valve casing having a passageway therethrough for flow of fluid, a rotatable valve plug disposed within said casing and having a hole adapted to register with the passageway when the plug is in open position, one end of said plug within the casing being formed to provide an annular shoulder, an abutting surface overhanging said shoulder and adapted to contact with the face thereof in a substantially annular area, means for urging said surface and

the latter the phrase, "means for urging said surface and shoulder together" is omitted and that the word "lubricant" underscored in Claim 14 appears as "lubricating" in 13.

Claim 14 calls for (1) a lubricant system substantially surrounding one of the passages in closed position; (2) the annular groove for lubricant between plug shoulder and overhanging casing; and (3) means for urging shoulder and casing together.

Appellee's valve has all three. We have already considered (1) in connection with No. 75. The peripheral shoulder ring of appellee's valve is the full equivalent of (2); and we think that the spring·which fitted into the casing beneath the plug in the accused valve obviously urged the surface and shoulder together as did the hydraulic pressure introduced beneath the plug in the patent. That the hydraulic pressure in a tapered type valve had the additional function of jacking the plug cannot serve to distinguish the accused valve from that described in the preferred form of No. 78.

Our conclusion is that Claims 6 and 7 of No. 75 and 13 and 14 of No. 78 are valid and are infringed; and that Claim 8 of No. 75 is invalid.

The cause is reversed and remanded for the entry of a decree consistent herewith.

shoulder together, a lubricant groove system substantially surrounding at least one of said passages in one position of the valve plug, a substantially annular intermediate lubricant groove interrupting said area of contact, and means for supplying lubricant under pressure to said annular groove and said lubricant groove system."