CAMPBELL et al. v. MUELLER et al.

MUELLER et al. v. CAMPBELL et al.

Nos. 10237, 10238.

Circuit Court of Appeals, Sixth Circuit.

Feb. 3, 1947.

John J. Mahoney, of Columbus, Ohio (John J. Mahoney, of Columbus, Ohio, of counsel; Corbett, Mahoney & Miller, of Columbus, Ohio, on the brief), for Campbell and others.

F. O. Richey, of Cleveland, Ohio (F. O. Richey and H. F. McNenny, both of Cleveland, Ohio, on the brief, Richey and Watts, of Cleveland, Ohio, of counsel), for Conrad B. Mueller.

Before HICKS, ALLEN and MILLER, Circuit Judges.

HICKS, Circuit Judge.

Suit by George R. Hunt, patentee, and Conrad B. Mueller, exclusive licensee,

804

against Harold C. Campbell, H. D. Thomas, d. b. a. The Thomas Company, and William E. Ginovan, d. b. a. Ginovan Poultry Market, for infringement of Patent No. 2,300,157, issued to Hunt October 27, 1942, for "Feather-Picking Apparatus for Fowls. * * *"

The principal defenses were, invalidity, and non-infringement. A counterclaim by appellants Thomas and Campbell asserting an implied license to the patent, was withdrawn. Although not specially pleaded, appellants relied upon the defense of unclean hands by reason of alleged knowledge by appellees of perjury committed by Campbell in Interference Proceedings involving Hunt, Campbell and others; and further relied upon an alleged attempt of appellees through their licensing arrangements to fix prices and control unpatented articles in violation of the anti-trust laws and in abuse of the patent laws.

Claims 2, 3, 7, 10, 12, 14, 16, 17 and 19 were in suit. Of these, the court held Claims 2, 3, 7, 10 and 17, for apparatus, and Claims 12, 14 and 19 for a "Finger" valid and infringed by plaintiffs' Exhibit 16. It held Claim 16 for a method, invalid. It found that appellees did not come into court with unclean hands and concluded that the license agreements under the Hunt patent were not in restraint of trade or in violation of the anti-trust laws, and did not constitute an abuse of the patent right or an attempt to control re-sale prices or to interfere with the exercise of any rights of purchasers of the patented machines, and were not contrary to the public interest. Hence these appeals by appellants and appellees' cross-appeal from the decree on Claim 16.

## Unclean Hands.

The facts as to the averment that appellees concealed Campbell's perjury in Interference No. 78,955 relative to the dates of the first drawing or embodiment of his invention of a Chicken Picker or Cleaner, seem to sift down as follows:

Campbell, in his preliminary statement in the Interference proceeding, declared that the first drawing of his invention was made in February 1935. Hunt disclosed a later date in 1938. It is now conceded that Campbell's date was falsified and that his embodiment was in late 1939 or early 1940, *after* he had seen a mechanical picking machine made by Hunt.

Nevertheless, in anticipation of the issuance of a patent to himself, Campbell entered into a licensing agreement with the Ashley Machine Company and became a stockholder therein. Campbell soon sold out his interest, with the understanding that he would receive an additional $5000.-00 if the Interference was successfully contested. He subsequently concluded that he had been induced by fraud to sell his interest in the Ashley Company and determined because of the "raw deal" he thought he had received, to disclose to opposite parties to the Interference that his filing dates were wrong.

Accordingly, he got in touch with Barker of the Barker Equipment Company, at Ottumwa, Iowa, who through Mueller, the licensee, was a sub-licensee of Hunt. There were several meetings, one in Chicago about ten days later, on August 11, 1941, attended by Barker, Mueller, Campbell and Bair, attorney for Barker Equipment Company, whereat Campbell "told them some of our filing dates I had found was wrong" and signed an affidavit declaring that the dates set forth in his preliminary statement were "erroneous." This was followed by a meeting in Cleveland at which were present Campbell, Mueller and his attorney Douglass, Frye, representing Hunt, Thomas, one of the defendants, McKinley of the Ashley Company, and Biebel, attorney for McKinley and the Ashley Company, at which meeting the Ashley people were confronted with Campbell's repudiating affidavit.

Biebel testified that he made an independent investigation and was convinced that the dates in Campbell's preliminary statement were not true and that as a consequence his clients "defaulted" on the main issue counts of the Interference and relied upon Campbell's narrow claims for fingers upon which Patent No. 2,302,525 eventually issued to him. A consent judgment in favor of Hunt, the senior party to the Interference, was entered on August 21, 1942.

Appellants base the charge of unclean hands upon the assertion that appellees had knowledge of Campbell's perjury which they did not disclose to the patent office nor to a district attorney. Appellees answer that they knew only that the dates were erroneous and not that they were falsified, until the second pretrial deposition just before the trial of the case. This knowledge was very promptly called to the attention of the District Court in the opening statement of appellees' counsel. On this question of knowledge by appellees of the falsity of the dates, there is only the testimony of Campbell, that they did know of the falsity. His testimony was that at the Chicago meeting he offered to give the information that the dates were wrong if they would pay him $5000.00, that he told them there that the dates were wrong, and that he knew they were wrong (although on cross-examination he stated that he told them the dates were wrong but not that they were false) ; that Bair, Barker and Mueller said they would give him only $2000.00 and not the $5000.00 asked for, that he thought Mueller said this; that after he signed the affidavit they said they couldn't pay him because, as Bair stated, they were afraid the court might hold them for tampering with a witness.

Against this was the testimony of Biebel, that at the Cleveland meeting when confronted with the affidavit, he asked if they paid Campbell anything for it; that Douglass answered "No," that Frye answered "No," and that Mueller said "No, we did not as much as buy him a meal." On the question whether Douglass had said that Campbell had given "false dates" he testified that he did not know whether they used the words "false" or "incorrect."

Bair's testimony was that Campbell never actually asked for money, although he left that implication. He admitted that they told Campbell they would not pay him but denied that any one said that they could not pay him until they knew what he had to offer. Bair further testified that Campbell said he had "found an error and we talked error all the time. That was all. Nobody talked or suggested or hinted that he had known that his dates were false at the time * * * he signed the prelimin-

ary statements." On cross-examination he testified that Campbell left the impression upon him that it was "just an ordinary mistake."

Frye, attorney for Hunt, testified that he learned of the Campbell affidavit by letter from Bair, dated August 12, 1941, that he called Mueller by phone in Cleveland to learn whether any compensation of any kind had been paid, and that Mueller said, there had not, either by him, Bair or Barker. He further testified that at the Cleveland meeting when Biebel "in spontaneous outburst" asked Campbell, "What did they give you for this, referring to the affidavit. Campbell's answer was 'Nothing.' "

Mueller testified that at the Chicago meeting, Campbell stated some of the dates in the preliminary statement were in error, and that at no time did he ask for money or intimate that he wanted money; that Campbell said he had discovered certain errors, and that what he had signed in the applications "was done more or less from memory," and that he was clearing his conscience.

Barker was ill and did not testify.

█ The court was the judge of the credibility to be given these contradictory witnesses and we cannot say that his conclusion that appellees did not come into court with unclean hands was "clearly erroneous." Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Upon the evidence we think he could not have found otherwise.

## Licensing Agreements.

The charge that appellees' license agreements constituted contracts in restraint of trade has two separate bases. Hunt by a contract signed February 14, 1940 made Mueller his exclusive licensee to manufacture, use and sell or have manufactured the feather picking apparatus disclosed in his application and Mueller agreed to pay him a 5% royalty. This agreement was modified on December 17, 1940 by permitting Mueller to grant sub-licenses. On February 1, 1941, Mueller granted to Barker Poultry Equipment Company (in a contract in which Hunt joined) "a non-exclusive license to manufacturer, use and sell apparatus embodying the inventions" and

806

it was agreed that this license to Barker would be "the only license granted under the * * * applications or patents for the use of those inventions in *automatic* apparatus. * * *" (Italics ours.) Subsequently on August 12, 1942, Mueller, joined by Hunt, entered into a non-exclusive agreement with the Ashley Machine Company "to manufacture, use and sell *manually* operated apparatus * * *" embodying the invention. (Italics ours.) Appellants particularly point to the second paragraph of Clause 1 of that agreement, which we quote in its entirety: "The parties understand and agree that this license is limited to manually operated apparatus and that it does not extent to or include automatic apparatus, that is, apparatus wherein a conveyor or other non-manual (sic) is used to convey fowls into contact with the feather picking apparatus and Ashley specifically agrees that it will not make or sell *such* automatic apparatus during the life of any patents included in this license." (Italics ours.)

Appellants assert that this language does not limit the license to manually operated apparatus covered by the patents, but covers unpatented *automatic* apparatus as well and is therefore reprehensible.

■ We cannot agree to this interpretation. The first clause states that the license covers manually operated apparatus and not automatic apparatus. The connotation of that sentence is clear. Palpably the reference there is to automatic apparatus which might be manufactured under the license. The second use of the term "automatic apparatus" is prefaced by the word "such." The reference is clearly to automatic apparatus previously referred to in the paragraph, which, as we have said, was covered by the license. We are brought to this conclusion by the first definition of the word "such" appearing in *Webster's New International Dictionary,* Second Edition: "1. Of this or that kind, character or measure; of the sort or degree *previously indicated or contextually implied.* * * *" (Italics ours.)

As to the second contention: Barker Poultry Equipment Company was a large manufacturer and seller of poultry equipment. Clause 11 of the agreement with it of February 1, 1941, was as follows: "11. The parties hereto agree that Mueller may specify, and from time to time alter, the minimum prices below which manually operated devices, licensed hereby, shall not be sold to the trade by or for the several licensees, and the parties further agree that, until altered by notice in writing hereafter from Mueller to Barker, they will not sell to the trade any manually operated licensed apparatus for less than Two Hundred and Fifty Dollars ($250.-00)."

The contention is made that Clause 11 created a price fixing arrangement which violated the provisions of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and that the courts should withhold their aid in the enforcement of a patent where plaintiffs are asserting their rights thereunder contrary to the public interest. See Barber-Colman Co. v. National Tool Co., 6 Cir., 136 F.2d 339; National Aluminate Corp. v. Permutit Co., 8 Cir., 145 F.2d 175, 180.

However, toward the end of the trial, appellees filed as Exhibit 61 a supplement to the agreement of February 1, 1941, executed on July 6, 1944, whereby Clause 11 was abrogated and cancelled and replaced by a simple agreement by Barker to pay a royalty of $12.00 on each feather picking apparatus sold by it under the agreement of February 1, 1941.

Appellants contend that since the price-fixing clause 11 was in effect when the suit was filed, appellees are bound by the issues then made and that the attempt to correct the license after the trial began is ineffective.

This is a suit in equity to enforce a patent right. If there is price fixing, the court simply withholds enforcement. Barber-Colman Co. v. National Tool Co., supra. But it is possible for the patentee to purge himself of the unfair business practice. Novadel-Agene Corp. v. Penn et al., 5 Cir., 119 F.2d 764, 767. The only evidence in the record tending to show price fixing by appellees is clause 11 above quoted. There is no evidence that the price fixing clause was ever invoked. The repudiating agreement, Exhibit 61, stated, and there has been no contradictory evi-

dence, that "none of the parties to the agreement have ever, in any way, enforced, relied upon, resorted to, acted upon, or conformed to the aforesaid Section 11 of such agreement or any other agreement or understanding on the subject of Section 11 * * *," and the District Court found as a fact in its Finding 29, to wit: "29. The license agreements, under the Hunt patent-in-suit, Plaintiffs' Exhibits 9, 10, 10-a, 11, 21, 21-a and 61 do not contain any conditions acting to enlarge the patent monopoly or to give the patentee Hunt or the licensee Mueller any additional monopoly or additional right which the statute and the patent together do not give. None of said license agreements, * * * contains any provision enlarging or abusing, or tending to enlarge or abuse the rights granted by the patent itself or any provision restraining trade or tending to restrain trade."

In Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 493, 62 S.Ct. 402, 405, 86 L.Ed. 363, the court, in a patent infringement case in which it was charged that the patentee sought to restrain contributory infringement, said: "It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest. * * * Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and *should do so at least until it is made to appear that the improper practice has been abandoned.*" (Italics ours.) See also B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367. This pronouncement seems to point the way to decision here.

 On the facts before us, the clause relied upon to set the stage for a prohibited use of the patent rights, was never acted upon, was cancelled and at the time of the decision the plaintiffs' conduct was blameless in practice and in intention. The court so found. There is a maximum, "Equity delights to do complete justice and not by halves." The maxim grows out of the desire of the chancery court to decide every question involved in the litigation so that there will be no controversy left out of which other suits may arise. No purpose would be served by putting blameless plaintiffs to the expense, and the courts to the trouble, of another suit when the issues can be settled here. We shall therefore proceed to consider the case on the issues of validity and infringement since it clearly appears that Clause 11 has been abrogated and cancelled, and since, on this record, there has never been in fact a misuse of the patent. Sylvania Industrial Corp. v. Visking Corp., 4 Cir., 132 F.2d 947, 958; Universal Sewer Pipe Corp. v. General Const. Co., D.C., 42 F.Supp. 132, 135.

## The Patent.

The Hunt patent relates to improvements in apparatus for picking feathers from fowls and particularly to the provision of novel "fingers" for use in removing feathers. The problem was to provide a machine which could be used to pick fowls economically, in lieu of hand picking, which was slow and tedious and hard on the pickers, and which resulted in skin tears and other injuries to the fowl. Such a machine, in addition to preserving the flesh without injury, should preferably preserve the "bloom" on the skin, which if maintained, adds to the salability of the fowl and keeps out germs; and finally, such apparatus must be capable of effective use on a fowl which has received a "slack" scald, that is, has been dipped in water no hotter than 128 degrees. Fowls which have received hotter scalds are easier to pick, but do not keep as long in cold storage and some times can not be prepared by cooks in the manner they might wish.

There was no mechanical picker on the market up to 1936. Practically all picking was by hand, with a supplementary wax dip to remove smaller feathers. Hunt, a rubber worker, began his experiments in 1931, using rubber flaps on a two-inch rotating pipe. He followed this with experimental disks, combs, etc. The first commercial model, consisting of a wooden drum, and hollow rubber fingers, was used on April 15, 1939.

The Hunt apparatus, patented in 1942, consisted of a hollow, motor-driven roller or drum from the outer periphery of which

a plurality of flexible fingers projected at an angle of inclination of about 14 degrees from the radial. The fingers were arranged completely around the drum in a plurality of spaced rows, each row of which was staggered with respect to the next. Being of flexible material, they could be mounted, removed and replaced by forcing the base through openings, extending through the rim portion, of the drum.

In the preferred form, the outside of each finger, for the greater portion of its length, was provided with a plurality of relatively closely-spaced corrugations or projections. In the preferred type these projections were indicated as screw threads, although it was said they might be in other than spiral form so long as they were spaced relatively close together to permit a number to come into contact with the fowl when bent. At the outer end was a flange or projection of larger size than the spirals, for which it was claimed in the specification, that it speeded up feather removal, since it more readily entered the indentations in the body of the fowl. In the preferred form, the outer portion of the finger was hollow for a considerable part of its length. The hollowed portion had a conical bore with the largest diameter of the opening at the outer end. The specification stated that a solid finger would remove feathers, but that the operation was speeded up by the hollowed finger. The finger was of such strength, according to the specification, that although it flattened out somewhat in operation, its wall would not collapse upon itself, even when, in contact with the fowl, it was bent almost at right angles.

The drum and motor which operated it were mounted in a frame. Illustrations indicated that the upper portion of the drum was supported at an elevation about waist high, and was wholly inclosed in front and partially inclosed at the sides and rear by metal shields.

The top portion thereof was exposed for operative purposes. The operator stood in front of the machine, and the exposed fingers moved in a direction away from him, although in their mounting they inclined backward from the direction of movement, toward the operator. In oper-

ation, the previously scalded fowl was held in contact with the moving fingers, and was manipulated to bring different parts of the body successively in contact therewith. The specification stated, "Since the angle of the fingers is opposite to the direction of rotation, the fingers are readily bent and the speed of rotation is such that some of the projections * * * are continuously in engagement with the feathers of the fowl and quickly remove these feathers without tearing or otherwise injuring the skin. * * * By providing fingers that are hollow at their outer ends, when these fingers are bent, they flatten out somewhat and present a greater area on each projection for contact with the feathers."

It was further pointed out that in the case of feathers difficult to remove, the pressure of the fowl against the rotating fingers could be increased.

It was claimed for this machine that its picking speed was 150 to 350 chickens per hour. It was certainly useful and met with speedy imitation. The drum and fingers could be used in an automatic process, although when so used, the evidence indicated that there was no attempt to clean pick; and were usually used in conjunction with the wax dip to which we have referred.

■ Machines manufactured under the patent were notably successful commercially. Hunt entered into a license agreement with Mueller in 1939. Sales that year were 60; the next year 580; in 1941, 854; in 1942 (with priority restrictions on steel) 551; in 1943, 871; and to April 30, 1944, 265. Gross sales for those years were $971,558.40.

Appellants insist that there was nothing revolutionary in the device, that it consisted basically of a rotatable drum with flexible fingers extending outwardly from the periphery thereof; and that this was an old combination operating in a number of prior art patents, including some in the chicken picking art. They point out rightly enough that lack of commercial recognition of prior art devices is not inconsistent with their full effect as anticipation, citing Republic Iron & Steel Co. v. Youngstown S. & T. Co., 6 Cir., 272 F. 386. But the same case adds the qualifications (on page 390)

that when the question is, not whether there is full anticipation, "but * * * whether the advance shown by the later over the earlier device is of an inventive character, the failure of the earlier to get recognition in the trade may be persuasive evidence that an apparently slight advance was more important than it seems." And no claim is made by appellants that any single device fully anticipates. Moreover, appellants' expert, Corey, admitted on cross-examination that he had never seen any of the prior art parts or devices in commercial use.

Corey stated on cross-examination that in the prior art the Berg, Bouda, Morrison and Swanson patents, and Jahns Patent No. 450,570 were about on a par as the nearest anticipations of the machine Claims 2, 3, 7, 10 and 17. We have examined all prior art cited, but shall confine our consideration to these five prior art structures.

Berg, Patent No. 1,217,393, consisted of two revolving shafts with brushes of soft non-metallic material, the bristles being of relatively great length with respect to the cores, to which they were affixed. The fowl was "interposed" between these brushes and the feathers removed by "sustained frictional contact." These long soft brushes were not the rubber fingers of Hunt; and but for the fact that the shafts to which the brushes were attached rotated, there was no likeness in apparatus or mode to Hunt.

In Bouda, Patent No. 1,372,595, a complicated arrangement of fluted rollers was provided to pick the feathers by pinching them loose, and an "auxiliary brushing or scraping means" whereby (as stated in one of the claims) "the feathers * * * are removed after they have been picked by the rollers." These beaters of rubber or flexible material were mounted on revolving shafts. "As the shafts are rotated, the beaters *brush or scrape* off the fine feathers or particles *clinging* to the birds. * * *" (Italics ours.) From the drawings these beaters appeared to be flattened strips, roughened on the stroking surface. Their function was obviously a clean-up job, after the picker had pulled out the feathers. There is not the slightest evidence that they were capable of removing feathers in the first instance.

Morrison, No. 837,330, disclosed a bizarre arrangement of tweezers or clamping jaws by which the feathers were plucked after which they might be withdrawn by pneumatic or other means. As in Bouda, there was an auxiliary "rotary brush having radial arms, the ends of which are provided with rubber flaps * * * for the purpose of removing the down from the bird *after the feathers have been plucked* by the rotary jaws pressing against the skin." (Italics ours.) It appears that this was simply a wiping action, the specification further stating, "After the feathers have been plucked the brids *may* be held in the path of the rubber flaps upon the ends of the arms of the rotary brush and the down may be easily and quickly wiped from the skin." (Italics ours.)

Swanson, No. 1,889,228, had a pair of spaced revolving rollers mounted at an acute angle to the horizontal, over which the fowl was passed by automatic means. These rollers were provided with hollow, perforated fingers, made of resilient material, and connected with a vacuum means. The feathers were supposed to be plucked by suction, and dropped by a blast of compressed air as the roller revolved. There is no similarity. Swanson depended upon suction; any mechanical action was incidental, and there is no evidence that it was functional, or could be, without drastic changes which would have made of it a different machine. Swanson achieved no recognition in the trade, but even if he had there was no substantial similarity to Hunt in the operation. Service Station Equipment Co. v. Air Scale Co., 6 Cir., 100 F.2d 498.

Jahns, German No. 450,570 was for a fish scaler, consisting of a table and revolving "brush roller" mounted thereon, against which the fish was held. The essence of this invention lay in the arrangement of the table surface. The part of importance to us is so indefinite, we can make nothing of it. The related patent to Jahns, German No. 450,571, shows short-toothed rollers, but there is no specification as to their length, or material, or how the ma-

chine would meet the delicate problem of removing feathers without injury to the fowl. The second Jahns patent, like the first, is indefinite on the matters important in this suit.

Exhibit V, which purported to have been made according to Jahns patent No. 450,-570, was in evidence as a physical exhibit. From our examination of this exhibit, we are convinced that it did not follow the Jahns disclosure, since the brushes were, proportionately to the roller, much shorter than those disclosed in the drawings. And the District Court, which witnessed a demonstration (not repeated before us) of this modification was unimpressed by it. This was peculiarly matter for the trial court. See LaBour v. Gorman-Rupp Co., 6 Cir., 108 F.2d 279. Similarly, a demonstration of a reconstruction of a portion of the Morrison patent seems not to have impressed the District Court.

Claim 2 is perhaps typical of the five apparatus claims: "2. A feather plucking device comprising a rotatable member having secured thereto means projecting from the outer surface thereof, said means being substantially cylindrical in shape, of elastic material, and having projections on the surface thereof, a portion of said means adjacent one end thereof being hollow."

■ There is a superficial resemblance to Hunt in some of the prior art structures, but in none of them was found the conception of breaking the feathers loose with scored fingers; on a moving drum; and none of this prior art was commercial. In a case of this kind commercial recognition is particularly important and the doctrine of Republic Iron & Steel Co. v. Youngstown S. & T. Co., supra, that a slight advance is more important than it seems, is peculiarly applicable. The District Court properly held the apparatus claims valid.

Corey listed Corley No. 858,371; Griggs No. 920,566, both fingers; Richards No. 1,755,665; Swanson No. 1,889,228; Morava No. 793,210; and Schelling No. 874,-251, as looking most like the fingers of the Hunt patent. We shall therefore confine our consideration to these six.

The fingers of the Corley patent were picking tubes on a Cotton Harvester. These were flexible, pneumatic tubes, hollow throughout, and were mounted on a revolving shaft which moved horizontally at a slow speed. The Morava disclosure also had hollow, flexible picky fingers which were open for the passage of air; these likewise were mounted on a shaft which caused them to revolve in a plane parallel with the ground. These hollow tubes, arranged for pneumatic action, and with little striking action, did not lie in the same art. See Merco Nordstrom Valve Co. v. W. M. Acker Organization, 6 Cir., 131 F.2d 277, 280. Nor did the shampooing implement of Schelling, which though having protuberances on its surface, was solid and was designed to rotate on its own long axis.

The Griggs patent showed a frame with two sets of spindles which rotated on their long axes. Both were hollow for the admission of air. The primary spindle had a comb on the end which was supposed to engage feathers which were drawn to it by suction through a slit in the end of the spindle. There was a flexible, innertube mounting which permitted the spindle to flex as the fowl was drawn through a box-like structure with these spindles projecting into it from all four sides. The secondary spindles had a picker-head of rubber, or light leather,—in a bellows-like arrangement. This head alternately contracted and expanded and was supposed to catch the feathers in indentations as it contracted and released them as it expanded. It is significant in understanding the operation, that both picker-heads were said to be mounted on "spindles." The primary movement was a rotation on the long axis with an additional in-and-out motion in the case of the secondary head. There was a flexible mounting at the base, but nothing to indicate that the tubes were designed for, nor would withstand, the battering effect which was a part of the Hunt design and operation.

The Richards patent disclosed a machine in which two revolvable shafts supported long "plucker-fingers" of soft rubber about $\frac{5}{8}$ of an inch in diameter and six inches

long. These fingers had rounded ends and to all appearances were of solid rubber and without protuberances. The fowl was towed through these rubber "brushes" on hangers and the only force exerted on the brushes was the weight of the fowl and that of the forward movement. It is obvious that these fingers had little similarity to Hunt's.

Swanson we have previously discussed. Although there was some striking action, the shafts were relatively small and the finger was designed for suction. The claim is made that the suction opening provided a roughness comparable to the ribs of Hunt. We cannot agree and find nothing basically anticipatory to Hunt.

Claim 12 was typical of the "finger" claims and we quote it below: "12. A poultry plucking finger member of the character described comprising a substantially cylindrical body formed of elastic material and having projections on the outer surface thereof, a portion of said body throughout its length being hollow, the walls of the body being sufficiently thick to avoid collapse in a direction parallel to the longitudinal axis when the finger is in use."

It is clear that the finger here claimed is different from those in the prior art which we have just examined. The District Court's findings of validity of the finger claims were correct.

The method claim 16 is as follows: "16. A method of plucking feathers from fowls comprising holding a fowl in position while continuously applying directly to only one side of the body thereof repeated applications of force in an arcuate direction and also to the feathered portion thereof while substantially simultaneously striking and rubbing said side and said feathered portion, the initial striking force taking place radially a distance outwardly from the application of the rubbing force and in substantially the same plane as the rubbing force, the opposite side of the fowl being freely exposed so as to facilitate ready handling by the operator, said rubbing forces being the main forces utilized in the removal of feathers."

The court found as a fact that Claim 16 "does nothing more than define the action which occurs when a flexible member carried by a wheel strikes or rubs an article being processed. This method has been used for long years by artisans and mechanics in connection with a rotating member, drum or wheel in buffing, grinding, polishing and otherwise cleaning various bodies or objects," and concluded that Claim 16 was invalid.

From this holding appellees prosecuted a cross-appeal. We think the claim must fall for another and better reason. It calls for a method of removing feathers, involving the repeated application to one side of the feathered portions of the body of a fowl, of force in an arcuate direction while substantially simultaneously striking and rubbing said side and feathered portion. The particular means used were fingers of rubber or other suitable flexible or elastic material; the claim as worded would cover *any* method of applying arcuate force. It is apparent that the inventor has drawn his claim to seek a broader monopoly than the described invention would justify and must fall for that reason. Holland Furnace Co. v. Perkins Glue Co., 277 U.S. 245, 257, 48 S.Ct. 474, 72 L.Ed. 868; Aluminum Co. of America v. Thompson Products, 6 Cir., 122 F.2d 796, 798; Heidbrink v. McKesson, 6 Cir., 290 F. 665, 668; Sylvania Industrial Corp. v. Visking Corp., supra.

Infringement

The alleged infringing device is described in Patent No. 2,302,525 to Campbell, which appears in the record as Plaintiffs' Exhibit 16. The Campbell patent discloses a frame, motor, rotatable drum with periphery studded with rubber fingers affixed in a staggered arrangement. The finger was an elongated, cylindrical rubber element, hollow for substantially half its length and bored the rest of its length to receive a fastening bolt. The outer half-portion of the finger was provided with a plurality of circumferential grooves defining shoulders capable of gripping the feathers of the fowl. The drawings of the Campbell patent reveal that the outer half of the finger did not have a conical bore

but was cylindrical throughout. Indentations or grooves defined the ribs. These indentations were three in number, and were cut into the fingers at approximately right angles to the outer surface with the bottom of the grooves in a plane parallel to the outer surface. Three heavy, sharp-edged ribs were thus defined toward the outer end of the finger. The width of the grooves was substantially equal to the width of the face portion of the ribs. Except that they were broader, these smooth-surfaced ribs were similar in appearance to the annular flanges at the outer end of the Hunt finger.

Two of the three Campbell claims call for two or more smooth-surface annular ribs. The third called for a rotating member with resilient plucking fingers with a plurality of smooth-faced circumferential ridges mounted thereon.

We think the apparatus thus described, with its rotary member and resilient, ridged, hollowed fingers mounted thereon, clearly infringes apparatus claims 2, 7, 10 and 17 of Hunt. The hollowed flexible finger with a plurality (two or more) circumferentially cut, smooth-faced ridges, clearly infringes finger claims 12 and 19. The fact that the ribs of Campbell were described as smooth-faced does not, in our opinion, remove his fingers from the language of the finger claims, which called for "projections" or a "plurality of projections" on the outer surface thereof.

However, we think the Campbell finger with a hollow cylindrical in diameter in its outer length falls without the express language in apparatus claim 3 and in finger claim 14; for, claim 3 described the fingers as follows: " * * * means * * * substantially cylindrical in shape, of elastic material, and having projections on the surface thereof, *a portion of said means having a thin wall and the remainder thereof having thicker wall portions.*" (Italics ours.)

We quote claim 14 in its entirety: "A poultry plucking finger of the character described comprising a substantially cylindrical body formed of elastic material and having projections on the outer surface thereof, *a portion of said body having a*

*thin wall and the remainder thereof having thicker wall portions,* the walls of the body being sufficiently thick to avoid a collapse in a direction parallel to the longitudinal axis when the finger is in use." (Italics ours.)

The italicized portions of these two claims, calling for walls of differing thickness, limit the two claims to fingers having that characteristic, and do not cover the even-walled fingers of Campbell. Claims 3 and 14 are not infringed.

The judgment of the District Court, that claims 3 and 14 are infringed, must be reversed. So modified, its judgment is in all other respects affirmed.