## COOPER v. WESTCHESTER COUNTY et al. (two cases).
### Civ. Nos. 19-51, 22-531.

United States District Court
S. D. New York.
Aug. 1, 1949.

Parkway Authority, maintain and operate toll highways for vehicular traffic.

These suits are against the named defendants for the installation, operation and use of alleged infringing toll registering equipment at Fleetwood Bridge in Westchester County, New York. The toll registering equipment at the Fleetwood Bridge was manufactured and installed by Automatic Signal Corporation, East Norwalk, Connecticut (now Automatic Signal Division, Eastern Industries, Inc.). Automatic Signal Corporation, the manufacturer of the equipment charged to infringe, assumed the defense of these suits.

The five patents in suit may be roughly divided into three groups: (1) The so-called "treadle" patent No. 2,165,227. (2) The three patents, Nos. 2,166,090, 2,205,-555 and 2,313,627 relating to "treadle circuits" which cause an electric counter to be actuated and count the vehicle. (3) Patent No. 2,196,194 relating to a "key operated Indentifier". They all relate to toll registering equipment; that is, equipment employed in connection with the registering of tolls for vehicles using a traffic facility such as a bridge, highway, or vehicular tunnel.

Plaintiff claims that the five patents in suit provide a system for automatically registering the tolls in such a way that every vehicle passing through a booth at a toll station makes its own record independently of anything that the toll collector can possibly do; that in this system there always is a permanent record check of the number of vehicles passing through such toll booth and an identification of the operator in each booth to whom those tolls are chargeable, and that moreover, the system includes means to assure its operation even when tampered with, thereby thwarting attempts by operators to put the system out of commission.

Mr. Kelley, plaintiff's expert, testified (Rec. P. 43) that: "The five patents in suit I think are conveniently grouped in terms of the instrumentalities. * * * All of these devices form an integrated system when used together. * * * In the matter that we are concerned with, they

Morris Kirschstein, New York City, Judah B. Felshin, New York City, of counsel, for plaintiff.

Duell & Kane, New York City, David S. Kane and Andrew G. Hubbard, New York City, of counsel, for defendants.

NEVIN, District Judge (Sitting by Designation).

These are two patent suits. They were tried together. Altogether, five patents are involved. Benjamin Cooper of New York is the patentee and owner of each and all of the patents. In Civil Action No. 19-51, the patents in suit are numbers 2,165,227, 2,166,090 and 2,205,555. In Civil Action No. 22-531, the patents in suit are numbers 2,196,194 and 2,313,627.

Originally an additional patent, No. 2,-086,605 (July 13, 1937) was included in Civil Action No. 22-531. That patent, however, was withdrawn from suit by plaintiff before the trial commenced. By stipulation, this withdrawal was made applicable not only to the defendants in this action, but to Automatic Signal Corporation as well. In view of this stipulation, no proofs were offered with respect to this patent, either upon the question of its validity or infringement.

Plaintiff is a manufacturer of electrical equipment for use among others, in connection with the collection of highway tolls at bridges, vehicular tunnels, parkways and the like. The defendants, Westchester County and Westchester Cross County

form a part of an integrated whole system."

Defendants contend that the five patents in suit do not "provide a system"; that each patent and each claim "stands on its own two legs," counsel for defendants saying in argument that: "Now, it is true that the question of tolls raises a problem, and it is true that the solution offered by Mr. Cooper is doing a job toward solving it. But the question here is whether this contribution that Mr. Cooper made, * * * is a patentable contribution. * * * To answer that question you are thrown back completely on the five individual patents, each by their own selves; and not only are you thrown back on each of the five patents separately, but you are thrown back on each single claim of each patent. * * * Each claim stands on its own two legs, and one claim can be valid and another claim be invalid; one claim can be infringed, another claim can be not-infringed; * * * Obviously, plaintiff in presenting this case and in trying to seize on something to hold on to, picked up this system. * * * If all these claims in this litigation read on a system and recited these elements all in a single claim, * * * if you had the subject matter of these five patents in a single claim so that you have a treadle mechanism and a key identifier and all these things built together and put into a single claim as a system for collecting toll, then there might be some room * * * for an argument * * * but we have got five patents, each that stands on its own."

Plaintiff agrees that each patent and each claim "stands on its own two legs" but in support of plaintiff's assertion that the five patents do "provide a system" counsel for plaintiff makes the following response: "I have spoken of these patents as relating to a system * * * not with the idea that they must be considered together. * * * Now, to this extent I am in agreement with counsel for defendants, namely, that each of these patents and their claims involved in this suit will have to be considered as a separate invention. * * * I do, however, make this point in regard to the use of the word 'system,' that under-

lying all of these five patents is this basic concept of the necessity for the provision of a pedestrian-proof or foot-operated-proof circuit and apparatus as a sine qua non for producing or having anything that will answer the purpose. * * * There is no claim here for a system as such including the key identifier, but there are claims here for a system in which a treadle containing three or four switches, * * * and with a circuit connected thereto, such that only the rolling action of a wheel will operate the counter, and such as cannot be duplicated by the pedestrian. * * * The word 'system' is used in the '090 patent (for a 'treadle controlled system') in which, in column 1, line 4, it is stated: 'An object of this invention is to provide a system of the character described for controlling the operation of an electric counter by passage of a vehicle over a treadle embedded in a roadway.'" (Patent No. 2,313,627 is for a "Treadle-controlled Toll Checking System.")

That each patent and each claim here in issue "stands on its own two legs" there can be no question (nor is any raised by counsel) and they will be so treated and considered by the Court in this Decision.

Some of the patents contain a number of claims. All are not relied upon. The date of each patent and the claims here relied upon in each patent respectively are as follows:

| Patent No. | Date | Claims Relied on |
|---|---|---|
| 2,165,227 | July 11, 1939 | 10, 27 and 28 |
| 2,166,090 | July 11, 1939 | 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12 |
| 2,205,555 | June 25, 1940 | 1, 1, 5, 7 and 14 |
| 2,313,627 | March 9, 1943 | 13 and 15 |
| 2,196,194 | April 9, 1940 | |

Plaintiff prays for damages; injunction; an accounting of profits; its court costs and "such other and further relief as this Court may deem equitable and just."

Defendants in their answers challenge the validity of each of the claims in issue of each patent in suit. They deny "each and every allegation" of infringement and

ask that the suits "be dismissed with costs to" defendants.

## I. Validity.

### Patent No. 2,165,227.

Patent No. 2,165,227 (Ex.1-A) is for a "Switch." It has been referred to in this case as the "Treadle Patent." It is stated in the patent that "this invention relates to switches and is particularly directed to a multiple switch treadle forming part of an electric system and adopted to be embedded in a roadway and actuated by the wheels of vehicles passing thereover and the like structure, * * * to provide a treadle * * * comprising at least two switches so arranged that they may be simultaneously and selectively actuated * * * by the wheels of a vehicle passing over said treadle * * * to provide a highly improved process for making a switch * * * provided with metal contact members effectively incorporated into a resilient housing * * * which may be embedded in a roadway and actuated normally to cause a flow of current to an electrically operated member, only by vehicles passing over said treadle and not by pedestrians or by weights placed thereon * * * to provide a treadle * * * comprising a plurality of complementary pairs of contacts, the construction being such that the first pair of contacts may be actuated first and said pair of contacts and a next adjacent pair of contacts thereafter actuated simultaneously, and said second pair of contacts and a next adjacent pair of contacts actuated thereafter simultaneously and so on until the last two pair of adjacent contacts are acuated simultaneously and the last pair of contacts actuated thereafter alone to cause a desired flow of electrical energy to an electrically operated member." Claims 10, 27 and 28 are here in issue.[1]

As stated by plaintiff, Cooper's concept of the manner in which the checking of a vehicular count could be freed from pedestrian and other errors was a dual one—it involved the use of a treadle, and of a correlated circuit.

The treadle is in the shape of an elongated rectangle which lies across a traffic lane. It is placed with its longest dimension at right angles to the direction of travel and in such position that the vehicles passing through the lane must roll over the treadle. The treadle is embedded in the ground so that its top surface is substantially flush with the surrounding area.

The treadle comprises a housing 11 of resilient material such as rubber in which switch units 12 are sealed. The switch units (sometimes otherwise referred to as "switches" or "contact units") are elongated and extend the long way of the treadle as seen in Fig. 2a. Each switch comprises a pair of contacts, to wit, an upper long metal strip and a lower long metal strip. The appearance of a switch in cross-section is shown in Fig. 2. The switches are co-extensive and side by side. Moreover, they are in the same plane and are parallel to one another. The top surface of the housing has elongated grooves 50 (Figs. 1 and 2a) disposed between the switches. The purpose of the grooves is to insure separate actuation of the switches.

There are three or more switches in the treadle. Each adjacent pair of switches is spaced apart less than three inches, so that adjacent switches are sufficiently close to be actuated concurrently as the wheel of a vehicle rolls over the treadle. Furthermore, the switches are so arranged that the upper and lower contact strips (also sometimes referred to as "contact means") of each switch are urged apart so that the switch normally is open. This spacing of the switches (plaintiff asserts) "is an important feature. With this spacing, if a person steps on the treadle, and the heel of his shoe closes one switch, the toe will close another switch, but an intervening

---

[1] Further and sufficient reference, for the purposes of this Decision, to these claims and to each and all of the claims here in issue of the respective patents in suit is made by the Court in its Findings of Fact and Conclusions of Law hereinafter set forth and made a part hereof; (Inasmuch, however, as Patent No. 2,205,555 contains only a single claim, that claim is later set forth herein, in full.)

switch, which is beneath the arch of his shoe, probably will remain open. Of course, a wheel rolling over the treadle would not miss any switches."

The upper and lower contact strips 70 and 77 (Fig. 2) are urged apart by the resilient side walls 64 of the housing, so that as soon as the wheel leaves any portion of the treadle, the switch at that portion will open. The treadle of this patent (No. 2,165,227) is an instrumentality which is intended, primarily, for use in conjunction with a toll counting circuit such as shown in any one of the three circuit patents in suit. (P. 1, Col. 1, L. 1–44).

In their answers defendants allege that this patent (No. 2,165,227) is invalid and void (among other reasons) because (a) the "alleged invention of Benjamin Cooper was patented to others in this or in foreign countries prior to his alleged invention or discovery thereof, or more than two years prior to the filing date of the application on which said letters patent were granted" and (b) "because Benjamin Cooper was not the original or first inventor or discoverer of any material and substantial part of the thing patented in said letters patent" and defendants cite and set forth in their answers a number of patents —some U. S. patents and some foreign patents—which they submit support these allegations.

All the United States Prior Art Patents are assembled in a book marked "Exhibit A." The foreign Prior Art Patents are in a book marked "Exhibit B."

While relying on all, defendants have, nevertheless, stressed in their brief and arguments only certain ones of these patents, and it will be to these that specific reference will be here made.

The patents now urged by defendants against patent No. 2,165,227 are as follows: United States Patent No. 1,487,771, to Weaver, March 25, 1924 (Exhibit A–6). This patent is for "Tire-inflation testing appliance."

The purpose of the device shown in the Weaver patent is to test the degree of inflation of an automobile tire. Defendants claim that this Weaver patent shows a treadle having a common bottom switch plate and four separate upper switch plates.

In addition to the patent itself, defendants took the deposition of Mr. Weaver (Exhibit C) and they submit that the evidence adduced in the Weaver deposition removes "any vestige of patentability to plaintiff's claims should they be sufficiently broadly construed so as to be infringed by defendants' treadle."

This (Weaver) patent was cited by the Examiner in the File Wrapper (Exhibit 42) of the '227 patent in suit. In the Weaver patent there are in reality three separate treadles, each comprised of two switches only. Weaver does not disclose a treadle comprising at least three cooperating switches, nor is there anything in the Weaver patent which would indicate that the switches are spaced apart less than three inches. The device of the Weaver patent is not one for counting vehicles or axles. It was meant to serve, and made to serve, an entirely different purpose. It would be inoperable for the Cooper "system."

Mr. Weaver testified that a device such as shown in his patent was made and installed in his garage and that it was actually used to test automobile tires and that it worked for the purposes for which it was designed. His deposition further shows, however, that the patented device to which he refers was made by his Experimental Department; that "it was tested out" and that it was used on one occasion at his plant and on another at his private garage. It is the view of the Court that neither one of these uses is sufficient to constitute a public sale or use of the device under the statute.

Patent No. 1,725,963 to Morris, August 27, 1929 (Exhibit A–7) for "Switch Means." This patent defendants say shows a single pair of switches embedded in a casing in which the upper and lower plates are biased or spaced from one another by means of rubber side-walls which collapse as the vehicle passes over them, and that the Morris Switching Means is, "in every respect the same as a single one of the switches in the treadle" of the '227 patent in suit and defendants submit that if four

of them were placed side by side in a treadle, "they would function in precisely the same fashion as does the Cooper treadle."

This patent too, was cited in the File Wrapper of the '227 Patent. It shows a treadle with a single switch only. It does not have multiple switches; it does not disclose grooves in the upper surface of the rubber casing between switching units or the spacing mentioned in Claims 27 and 28 of the '227 patent.

Defendants' suggestion is that the single switch of the Morris patent could be duplicated four times to anticipate the treadle claims. Plaintiff urges, and properly so, as the Court views it, that Cooper, by using at least three switches spaced less than three inches apart has secured an unique achievement with respect to foot-proofing. It is something which would not be expected to be obtained by mere duplication.

Patent No. 2,077,924 to Geer, April 20, 1937, (Exhibit A-14) for "Control." The application for this patent was filed on April 8, 1930. It is owned by defendants' manufacturer. This patent shows a treadle with only two switches. It would not be "foot-proof." No dimensions are given as to the spacing of the switches.

Patent No. 1,950,490 to Geer, March 13, 1934, (Exhibit A-11) for "Electric Switch." The application for this patent was filed on May 4, 1928.

Patent No. 1,928,472, to Wilcox, Jr., September 26, 1933 (Exhibit A-10) for "Switch." Application filed July 30, 1931. Geer patent 1,950,490 was cited in the File Wrapper of the '227 patent in suit. Wilcox patent No. 1,928,472 was not cited in the file wrapper. Both are owned by defendants' manufacturer.

Defendants submit that these patents each show a treadle switch in which the upper plate it deflected downwardly against the bottom contact plate through a dishing of the upper plate.

These patents each show a single switch only. There are no parallel switches side by side. They do not disclose a treadle which is "foot-proof" and which will respond to the rolling motion of a wheel. They do not meet any of the claims of the '227 patent in suit.

### The (3) Circuit Patents.

(a) Patent No. 2,166,090; (b) Patent No. 2,205,555; (c) Patent No. 2,313,627.

#### (a) Patent No. 2,166,090.

Patent No. 2,166,090 (Ex.1-B) is for a "Treadle Controlled System." It has been referred to in this case as the "Uni-directional Patent." The alleged purpose of the invention of this patent is the prevention of counting except where the vehicle passes over a treadle in one direction only.

It is stated in the patent that the invention relates to a treadle-controlled system for operating electric printing counters and the like devices; that its object, among others, is to provide a system for controlling the operation of an electric counter by passage of a vehicle over a treadle embedded in a roadway. The system includes means for actuating the counter each time the front or rear wheels of a vehicle roll over the treadle, when moving forwardly, and means to prevent actuation of the counter should a vehicle be driven backwardly over the treadle, whereby the system is uni-directional and the counter can be operated only when the vehicle rolls over the treadle in one direction. It is recited in the patent that a further object is to provide means to prevent the counter from being actuated more than once, should the wheels of the vehicle passing onto the treadle cause actuation of the counter and then oscillate, or roll backward and forward while still in contact with the treadle. Claims 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 are here in issue.

The "system" employs a treadle such as disclosed in the treadle patent (No. 2,165,-227.) The several switches of the treadle are connected in a circuit with switch relays and an electro magnetic counter. There are two types of such electro magnetic counters. In one, the count is made on energizing the counter, and in the other the count is made upon de-energizing the counter. Both types are well known. The exact connections, relays, switches, etc., in

the circuit, are fully described, both in the patent and in the record (pp. 112 to 143).

The circuit of the '090 patent will register on a counter 17 the number of axles of vehicles passing over the treadle in one direction only. The treadle has four switches, each comprising a pair of contacts. The four switches are numbered 12, 12a; 13, 13a; 14, 14a and 15, 15a. They will be here referred to as 12, 13, 14 and 15. The treadle is adapted to be embedded in a roadway transversely thereof so that it will be contacted by wheels of a vehicle riding thereover. The switches are elongated, parallel and spaced apart less than three inches so that, as a wheel rolls over the treadle, the switches will not be individually closed without an overlap. The term "overlap" is used to denote that two adjacent switches are inclosed, or "actuated", condition at the same time. The term indicates a condition also described as "concurrent."

Due to the foregoing physical arrangement, a wheel rolling over the treadle will cause switches 12, 13, 14 and 15 to be actuated successively and, subsequently to open successively, and moreover, will cause two or more adjacent switches to be actuated concurrently.

This physical response of the three or more treadle switches to the action of a rolling wheel is what is used electrically by the circuit of the patent to make a count. The circuit is so designed that it will register a count electrically only when all the switches are actuated successively and adjacent switches are actuated concurrently. If the switches are not actuated physically in this special way, the circuit will not operate electrically to register a count.

Furthermore, the circuit is so designed that should a wheel roll over the treadle in a rearward direction, successively closing switches 15, 14, 13 and 12, no count will be made on the counter 17. In other words, counts only can be made on the counter 17 when the wheel rolls in a forward direction.

Vehicles at a toll booth sometimes stop while the wheels are still on the treadle, and due to various causes, the wheels at times roll rearwardly and forwardly while still in contact with the treadle. Later the vehicle will move forwardly off the treadle. Sometimes a vehicle backs up somewhat while its wheels are on the treadle.

Plaintiff asserts that one feature of the invention is the provision of means for preventing the counter from being actuated more than once under the foregoing conditions, and that "this feature solved an important problem in connection with operation of the treadle because it is obvious that if, due to vibration or back and forth rolling of a wheel, more than one count would register when the wheel rolled off the treadle, excuse would be given to the operator for not turning in all the revenues collected."

### (b) Patent No. 2,205,555.

Patent No. 2,205,555 (Ex.1-D) is for a "Treadle Circuit." It has been referred to in this case as the "Forward and Backward" or "Two-directional" patent. It provides an electrical circuit in conjunction with a multi-switch treadle which will count traffic flowing in either direction by means of a forward or a backward counter.

It is stated in the patent that "this invention relates to treadle circuits and is particularly directed to a multi-switch treadle adapted to be embedded in a roadway and traversed by vehicles and a circuit controlled by the actuation of the treadle switches by vehicle wheels rolling over the treadle to operate counters for registering the vehicle axles."

Among others, the objects of the invention as set out in the patent are "to provide a treadle circuit having means to count axles of vehicles passing over the treadle in one direction on one counter and to count axles of vehicles passing over the treadle in the reverse direction on another counter, * * *" and to provide "a circuit so arranged as to prevent counting if crossing of the treadle is not completed in either direction."

Experience disclosed that vehicles sometimes cross the treadle in a forward direction, then back up past the toll booth and

then again move forwardly. In such case, the axles would be counted twice. This patent provides for counting cars going over the treadle in both directions. The circuit includes a forward counter and backward counter. Cars crossing the treadle in a forward direction are counted on the forward counter only, and cars crossing the treadle in a backward direction are counted on the backward counter only.

If cars should go forward, back up and then again go forward, they would make two forward counts and one backward count. It is only necessary to subtract the count on the backward counter from the count on the forward counter to have the true number of axles passing the toll booth and for which toll revenue should have been collected. Plaintiff asserts that "this patent and its application made it impossible for collectors to give the backing up of cars as an excuse for not turning in the correct amount as indicated by the counters."

In this patent, the same treadle is used as in the '090 patent, which is the same as the treadle shown in Patent 2,165,227 in suit. In this ('555) patent, the treadle switches are indicated by the numbers 1, 2, 3 and 4. The forward counter is indicated by the numeral F 12 and the backward counter by the numeral B 12. The two counters and the switches are interconnected in one circuit with various relays, switches, and wires. The complete operation of the various relays and switches, as the vehicle passes over the treadle forwardly and backwardly is described in the record. (pp. 160-178).

The treadle is adapted to be installed on a roadway transversely of the direction of vehicular traffic. The same conditions of concurrency for the operation of adjacent switches are required in this patent as in the '090 patent. The concurrency can be of two, three or four switches.

This forward and backward circuit also is foot-proof, but will respond to the rolling motion of a wheel. The switches must be actuated sequentially to make a count in either direction and since they are parallel and side by side, the wheels of a vehicle will provide the necessary concurrent actuation of two, three or four switches depending upon the softness or size of the tire.

A partial entry of the wheel upon the treadle and then backing off will not produce a count. Also, if a person walking on the treadle misses any of the switches there will be no count.

The patent contains but a single claim which reads as follows: "In combination with a multi-switch treadle adapted to be installed on a roadway transverse of the direction of the vehicular travel, and comprising a set of more than two parallel switches disposed side by side, and adapted to be actuated sequentially when a wheel of a vehicle traverses the treadle, a forward counter and a backward counter, and a circuit connecting both counters with the above mentioned set of switches, including means to count on the forward counter, when said switches are closed sequentially in one direction, and to count on the backward counter, when the same switches are actuated sequentially in an opposite direction, and said circuit having means to make a count on one of said counters, only upon actuation of more than two of said switches, and on the other counter only upon the same switches being actuated."

#### (c) Patent No. 2,313,627.

Patent No. 2,313,627 (Ex.1-E) is for a "Treadle Controlled Toll Checking System." It has been referred to in this case as "The Shorting Patent." The alleged purpose of the invention is to permit counting with the device even though some of the switches in the treadle have been "shorted," either accidentally or by deliberate tampering.

In the patent it is recited that "in Toll Checking Systems, it is imperative to obtain an accurate count of vehicles passing the point of toll collection * * * false counts may be obtained by shorting of one or more of the switches, as a result of tampering or by placing a weight on the treadle" and that an object of this invention is to provide in a counting system "controlled by a vehicle actuated multi-

switch treadle, means to count the axles of vehicles even if a switch or certain selected switches are shorted." Claims 1, 5, 7 and 14 are relied on.

Plaintiff states that "this patent cured certain defects or took care of certain situations which arose particularly in connection with isolated toll installations which could not be watched. With prior circuits it was possible to put a weight on a part ·of the treadle to short or close, let us say the first or last switch, and keep it shorted or closed. This would put the circuit out of commission, so that accurate counts would not be obtained."

"The purpose of the '627 patent is to provide a circuit which is so arranged that directional counts will be obtained on forward and rearward counters, notwithstanding the fact that either the first switch or last switch is shorted and kept shorted as a wheel rolls over the treadle. In the patent the expression "bridged" is used synonymously with the term "shorted." The same treadle is used as in the previously described Cooper patents."

In this patent, the switches are numbered 1, 1a; 2, 2a; 3, 3a and 4, 4a, and they will be termed switches "1", "2", "3", and "4" herein. A forward counter F is provided as well as a rearward counter R. The forward counter will operate when a wheel rolls over the treadle in a forward direction, sequentially closing switches 1, 2, 3 and 4 and concurrently closing at least adjacent switches. ...

The forward counter, the rearward counter, and the switches 1, 2, 3 and 4 are all interconnected in a circuit with various relays and switches. These were described in detail in the record. (pp. 178 to 192).

In their answers defendants allege that all and each respectively of the three so-called "Circuit Patents" above referred to are invalid and void for the same reasons alleged with regard to Patent No. 2,165,227 and hereinbefore set forth. Again, numerous alleged prior art patents, both United States and foreign, are plead by defendants in their answers, but only certain ones are urged in their brief and arguments and these only will be here referred to.

They are as follows:

(a) As to Patent No. 2,166,090

Patent No. 543,597 to Dixon, July 30, 1895 (Exhibit A-1) for "Track-Instrument."

Defendant states that this Dixon patent shows a circuit for counting directionally the wheels of a vehicle passing over a track treadle and that it has automatic de-energization to the same extent that Cooper patent No. 2,166,090 has it.

While conceding that the Dixon circuit antedates automobile traffic, defendants' expert, Professor Ballard, testified, (R. P. 833) that he thought "it would not be too difficult to replace the levers 80' and 80 with some type of contact mechanism and utilize the material described in the Dixon patent to count highway vehicles. It will be noted that the date of the Dixon patent is 1895, before there were very many automobiles on the road."

The invention of the Dixon patent, however, relates to track-instruments "for operating the circuits of electrical railway signalling systems" wherein "the signal-circuits are controlled by automatic registers which count or register wheels, cars or trains entering a block or section of track."

The purpose of the invention claimed in the Dixon patent is entirely different from that of the patent herein suit. Its circuit has only two switches, so that it is not "foot-proof." It has no elongated roadway treadle; it does not insure full operation of the counter, (if there should be one) upon too rapid passing of a car, and it does not automatically de-energize any counter.

The Court agrees with plaintiff that this patent is wholly lacking as an anticipation.

Patent No. 1,792,835 to Grondahl, February 17, 1931, (Exhibit A-8) for "Apparatus for the Control of Highway-crossing Signals." This patent shows an electric circuit to be actuated by a railway train. It was cited by the Examiner in the File Wrapper (Ex. 43) of the '090 patent. It is for a railroad device which includes no treadle whatsoever. Five spaced photoelectric cells are located on opposite sides of the railroad track, so that a train passing

through interrupts the beam of light and thus in effect closes a switch.

Defendants submit that there would be no difficulty in substituting a counter for the bell of Grondahl and that "like the '090 circuit, it is uni-directional and not affected by trains backing up through the light beams."

In Grondahl, however, the bell S can be made to ring when a railroad car cuts across only the two photo-electric cells L-2 and L-3. The Grondahl device, therefore, could not be "foot-proof." In Grondahl there is no treadle adapted to be placed in a roadway and transversed by vehicles. The switches are not spaced apart uniformly less than three inches. It has no rollback feature and no automatic de-energization of a counter. Grondahl does not meet any of plaintiff's patents.

Patent No. 1,810,211 to Hershey, June 16, 1931, (Exhibit A-9) for "Registering System." This is another device to count axles of railway cars passing over a section of track. The circuit of this patent counts in either direction. However, Hershey has no treadle embedded in the roadway nor any elongated switches disposed side by side. The patent shows only two switches so that it would not be "foot-proof." It does not provide for rollback nor means for insuring energization should a fast vehicle pass over the track. It does not treat the problems of counting vehicles on a roadway and is not an anticipation of plaintiff's patents.

(b) As to Patent No. 2,205,555.

All of the patents hereinabove referred to are urged by plaintiff against the '555 patent in suit. In addition, as to the '555 patent, the following are stressed: Patent No. 2,046,157 to Gibbs, June 30, 1936 (Exhibit A-12) for "Track Instrument." Gibbs shows a circuit for counting railroad cars. This patent was cited by the Examiner in the File Wrappers of the '090 patent.

Defendants state that it shows a two-switch treadle requiring sequential and concurrent operation to get a count and that it also has means for automatically de-energizing the circuit after the same has be-come energized and that it has "a rollback safeguard."

Defendants' Expert testified that in his opinion the Gibbs circuit could be adapted for use in a vehicular roadbed, saying (R. P. 862) that: "If the switcharms 25 and 25a are replaced by appropriate treadle contracts, I see no reason why the circuit could not operate quite satisfactorily."

However, this device is a two-switch instrument, so there would be no "foot-proofing." The patent discloses no treadle adapted to be embedded in a roadway. The counter circuit in Gibbs opens when the last switch 25a opens so that if Switch 25a is not closed long enough for the counter to operate, there would be no count. In Gibbs, if with one switch closed the other switch is repeatedly opened and closed, there will be a succession of counts on the same counter. Thus Gibbs does not have the rollback feature. It does not anticipate the patents in suit.

Patent No. 2,048,192 to Marston, July 21, 1936. (Exhibit A-13) for "Counting System." This patent shows a circuit for counting lumber as it moves across a cutting plate on a platform that is mounted on wheels and rolls on a track. The purpose is to insure lumber being sawed in uniform lengths.

Defendants claim that it shows a counting circuit in which means are provided to insure complete actuation of the device after such actuation has been initiated and that this is done in the same manner as set forth in the '555 patent.

Marston, however, is not for counting wheeled vehicles. It does not have an elongated treadle embedded in a roadway and with three or more switches spaced less than three inches apart for recognizing passage of a rolling wheel. It does not have means for insuring actuation of the counter regardless how fast the boards shown in the patent move past the switches. In plaintiff's device it matters not how quickly the switches operate.

Patent No. 2,077,924 to Geer, April 20, 1937, (Exhibit A-14), for "Control." This patent has been heretofore referred to in connection with the '227 patent.

British patent 373,646, to Vereinigte, Exhibit B-4. This patent was cited in the file wrappers of both the '555 and '627 patents. It shows a train counting circuit that directionally counts cars passing in either direction.

Defendants state that it employs four switches to be actuated sequentially and concurrently and incorporates a rollback feature to prevent false counting and means to insure complete actuation of the counting device.

However, it has no treadle embedded in a roadway. Although it shows a device having more than two switches, it is such that upon operation of only two selected switches, the counter will be actuated so that it is not "foot-proof." As stated by plaintiff, "In measuring a prior art device against the Cooper patents the question is not whether a count can be made by the prior device upon closing of three switches. If, as a matter of fact, it is possible to get a count upon closure of two switches only, the prior art device cannot possibly be foot-proof."

Further, there is no disclosure that the switches are spaced apart uniformly less than three inches. This patent uses different switches to obtain a forward count from those to obtain a backward count. It is inadequate for the purpose sought by the patents in suit.

### As to Patent No. 2,313,627.

In addition to some of the other patents hereinabove referred to, defendants specifically refer, in support of their allegations as against this ('627) patent, to British patent 232,340, to Carlisle, April 29, 1925, (Exhibit B-1) for "Improvements in devices for registering automatically and indicating the number of passengers on a Tram Car, Omnibus or similar Stage Vehicle."

Defendants claim that Carlisle shows a four switch treadle circuit for counting passengers, having forward and backward counters, and depending on the direction that the treadle switches are closed for a proper recording of the count, and that the switches must be closed sequentially and the middle two switches of the four shown, must be closed concurrently to actuate the counter.

In Carlisle, however, the register can be operated by only two switches going in one direction and by only two switches going in the opposite direction. The patent reveals that it is its purpose to have the device operate by means of steps of a bus and a register for registering persons walking up and down the steps. It states: "This invention relates to an improved device for automatically registering and/or indicating the number of passengers on a tram car, omnibus or similar stage vehicle, the number of persons ascending and/or descending a flight of stairs, entering a building or for similar purposes. * * * As either step of each pair completes the respective circuit there is no possibility of a passenger ascending or descending the stairs failing to cause the mechanism to operate by omitting to tread on one of the steps."

Although the patent shows several switches since its device can be operated by only two switches it is not "foot-proof." It does not show a multi-switch treadle, nor elongated switches side by side, spaced apart less than three inches. Carlisle shows none of the shorting features of the '627 patent. Carlisle does not require operation of four switches to operate the register in one direction and the same four for operating another register in an opposite direction.

The purpose of the Carlisle device is to count people, not automobiles. It would not serve the objectives sought by Cooper.

### Patent No. 2,196,194

In Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, at page 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, it is stated that: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. Irvin v. Buick Motor Co., 8 Cir., 88 F.2d 947, 951; Aero Spark Plug Co., v. B. G. Corp., 2 Cir., 130 F.2d 290; Franklin v. Masonite Corp., 2 Cir., 132 F.2d 800. It has come to be

recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F. 2d 541, and the District Court in this case following what will usually be the better practice by inquiring fully into the validity of this patent."

In the instant case the Court has followed the procedure above suggested and has gone "into the question of the validity of the patent" (No. 2,196,194) although (as will later appear) it finds and holds that it is not infringed by defendants' structure.

■ Patent No. 2,196,194 (Ex.1-C) is for a "Key operated Identifier." It has been referred to in this case as the "Key Identifier Patent."

It is stated in the patent that "an object of this invention is to provide an identification unit for use in registers, watchman systems, and the like purposes, and having a pulser actuated by a key to actuate printing counters whereby a number may be printed corresponding to the shape of the key" and to provide "means for preventing turning of the key or causing pulsation until the key is completely inserted within the unit" and "for automatically resetting the number indicator or counter to zero when the identification key is withdrawn from the unit." Claims 13 and 15 are in issue.

According to the patent, the identifier comprises a box in which a key cage 23 is mounted. The operator or collector at the toll booth is given a key 11 which he inserts into the cage and turns through an angle of 90°, when he goes on the job. When he goes off the job, he turns the key back 90° and removes it. The key 11 has two cutaway portions 14 on outside edges thereof forming shoulders 14a. The characteristic number identifying the key, or the operator who is charged with possession of the key, depends upon the locations of the shoulders 14a. The location of one shoulder determines the unit digits of the identifying number and the other shoulder determines the tens digit of the number.

Within the box are a pair of segmental gears 67, only one of which is shown. As the key is inserted into the box, a finger 69 mounted on the segmental gear in the

path of the key will not be moved until the shoulder 14a at the end of a cut-out 14 reaches the finger. As the key is pushed further into the box it will move the finger 69 and therefore will rotate the segmental gear while tensioning a torsion spring 88. The segmental gear 67 is connected to a gear 78 by a mechanism which turns the gear 78 only when the segmental gear 67 rotates in a direction opposite to that in which it is rotated upon pushing the key into the box. Thus, as the key is inserted it will not turn the gear 78. When the key is fully inserted, it is turned in a clockwise direction, looking at Fig. 4 of the patent drawings, through an angle of 90°. This movement disengages the key from the finger 69 and permits the torsion spring 88 to rotate the segmental gear in an opposite direction. As the segmental gear rotates in such direction it will turn the gear 78 and a pulser 81 mounted on gear 78. At any time after the pulser has been operated, the key may be turned back 90° to its original position and then withdrawn. This explanation relates to one shoulder or one edge of the key. The same action occurs for the opposite edge of the key as there are two segmental gears and two pulsers, marked 81 and 81a, respectively.

Also within the box are two electromagnets 97 and 98 provided with coils 97a and 98a, respectively, and having the usual actuating mechanism for operating a pair of counter wheels 97b and 98b. In addition, there is provided a printer comprising a solenoid 110. The arrangement of the identifier is such that turning the pulsers causes the electro-magnets to operate the counter wheels to an extent depending upon the number of pulses, which in turn depends on the location of the shoulders 14a.

Thus, if a key is so shaped as to produce 9 pulses on the "tens" edge of the key and five pulses on the "units" edge, the counter will pulse to a point where a "9" and a "5", respectively, appear at the bottom of the counter wheels, so that when a print is made the number "95" will be printed.

The time of the day also is printed simultaneously, so as to record the information that operator No. 95 checked in or

started operating the toll booth at a certain time. When the same operator goes off duty, he turns the key back 90° and takes it out. The physical and electrical arrangement of the identifier is such that this action will make a second print on this occasion of the number "00". The time again is printed simultaneously. The appearance of the number "00", and the time next to it, records the information that the operator went off duty at a certain time.

The key cannot be removed without obtaining a second print and the key remains within the box between the first and second prints. The printing is automatic and is done remotely by means of the electrical connections between the pulsers in the key box and the electro-magnetic counters and printing mechanism.

Plaintiff asserts that "the provision of an identifier capable of making these two prints automatically is extremely important because by means thereof the operator can be made wholly responsible for collections at his toll booth from the time the key is inserted to the time the key is withdrawn. He cannot fool the identifier because, as he frees his key, he leaves a record of his action in the form of a second print."

In their answers defendants challenge the validity of Patent No. 2,196,194 upon the same grounds as set forth with respect to the other patents in suit.

## As to Patent No. 2,196,194.

Of the number of patents referred to in their answers as supporting their allegation that patent No. 2,196,194 is invalid and void, defendants specifically refer to and apparently rely upon four, all of which are file wrapper references.

These patents are as follows: Patent No. 1,253,051 to Knistrom, January 8, 1918, Exhibit A-2, for "Recording-Lock." Defendants state that this patent shows a mechanism for printing a key indentification when the lock is unlocked and again where it is locked. The same identification is printed both times.

In the device of this (Knistrom) patent a key is inserted into a cylinder and turned to open a lock and in doing so, a print is made. The key then may be removed while the lock is open without making a second print. The key subsequently may be inserted and turned to lock the lock and then a second print is made.

The Court agrees with plaintiff that this patent cannot anticipate the identifier claims of the patent in suit and could not possibly be used to accomplish plaintiff's purpose. In fact, it is exactly the opposite. In the device of the '194 patent in suit, the key cannot be removed without getting a second print.

Patent No. 1,357,715 to Larrabee, November 2, 1920 (Exhibit A-4) for "Recording-Lock."

Defendants state (and plaintiff agrees) that this patent (Larrabee, 1,357,715) "is quite similar to Knistrom (Ex. A-2)". Plaintiff asserts that in fact the "construction is the same as Knistrom's." In the device of the Larrabee patent, the key can be removed after unlocking, without getting a second print. The key must be reinserted and turned to lock in order to get a second print.

Patent No. 1,258,803 to Ohmer, March 12, 1918, (Exhibit A-3) for "Automobile-Service Recorder." Defendants claim that the Ohmer patent calls for the insertion of a key and then the rotation of a separate knob which controls a cam for advancing the key into identifying printing position, and that two identifying printings are provided, both of them the same.

However, in the Ohmer patent, there is no key having different shapes. In Ohmer the key is formed with a raised letter or number against which the print is made. In other words, the print is made directly against the key. There is no means between the key and the identifying element which enables printing to be done remotely. In Ohmer there can be no remote printing inasmuch as in this patent the actual printing is done where the key is. It seems apparent that neither Knistrom nor Larrabee, nor Ohmer had the same concept as Cooper nor do their respective patents disclose a structure which would accomplish the result which Cooper sought.

Patent No. 1,466,448 to Katz, August 28, 1923 (Exhibit A-5) for "Annunciator or Indicator System." This is a patent on a pulsing identifier. Insertion of the key winds a pulser and its removal permits the pulser to operate. Defendants submit that in the Katz disclosure a print is obtained when the key is withdrawn and the printing mechanism is controlled by such withdrawal.

However, in the Katz patent there is no provision whatsoever for any record or print being made. Katz discloses apparatus wherein a key is inserted and then removed and a number of pulses will be made in accordance with the shape of the key. There is no first printing or second printing, so that there cannot be a provision for a first printing when the key is inserted and a second print at the time the key is to be withdrawn.

On the basis of their alleged prior art patents the testimony of their expert witness, Professor Ballard, and all of the other evidence in the case, as disclosed by the record, defendants assert that "The use of electrical circuits for counting or otherwise controlling the flow of vehicular highway traffic is old and well-known. It in turn stems from a similar use of electrical circuits to count and control the flow of vehicular rail traffic, the latter having reached a fair degree of importance before highway vehicular traffic had reached the density where automatic control was necessary or desirable.

"The principle of operation of all devices in both the rail and highway field is the same. The vehicle in passing along its path of travel rolls over a treadle type switch or switches which in turn are closed by the weight of the wheels of the vehicle passing over them. The closing of the switch or switches permits the flow of electrical current through a circuit to energize a counter mechanism or a signal of some type which in turn either records the presence of the vehicle or transmits an alarm to it or following vehicles.

"Any electrical system of the type just described can be divided into two distinct parts, each more or less independent of the other. First you have the switch which is usually in the form of a treadle or other device over which the wheels of the vehicle pass bringing an upper and a lower switch member together thus permitting electric current to flow through the switch. Long before any of the patents in suit were thought of, treadle mechanisms of this type involving one or several switches were in wide-spread use. They are essentially no different from any other electric switch and serve the identical function of other types of switches. For example, the commonplace electric door bell push button is an electric switch which is closed by the pressure of the finger instead of the weight of the wheel of a vehicle, but responds electrically in precisely the same fashion by bringing together a gap in an electric circuit and permitting current to flow therethrough. Second, you have the electrical circuit which is energized by said switch. The electrical circuit patents all deal with circuits which when energized perform certain functions, as, for example, the actuation of a mechanical counter and printing mechanism for recording the number of vehicles that pass over and close the circuit switch. In each of the circuits of the patents in suit, features are present that purport to prevent false counting. This is accomplished through the expedient of interlocking relays which must be operated in a predetermined sequence before the final stage can be completed and the counter and printing mechanism made to operate. Neither the problem nor the solution are new. The reason that prompted designing of interlocking circuits both in the prior art and in the patents in suit was the attempt to avoid false counting. The prior art solved this problem as effectively as the patents in suit."

However, the record shows that the problem of insuring an accurate count of vehicles passing through toll collection stations became more and more acute with installations for vehicular traffic running into millions of dollars. These properties were built under public supervision and under a plan whereby after a certain number of years, when the bonds were amortized, the public could freely use the facili-

ties; tolls were charged to pay the interest and amortization.

The fact that the bonds were secured by revenue from the traffic facilities made it absolutely necessary that the revenues be safeguarded against pilferage, loss by carelessness or otherwise, by collectors or others. Accurate recording of the number of vehicles passing the toll station became imperative, so that there could be no excuse for failure to turn in the full amounts collected.

There is an important distinction, as plaintiff points out, between the prior art relied on and the field in which Cooper worked. For a census of the number of vehicles that pass a traffic intersection, it is not important that the count be absolutely accurate; and inaccuracy of as much as ten percent would probably still respond to ordinary statistical requirements. A count of how many railroad cars pass through a station or railroad yard at various times during the day again is something statistical which ordinarily need not be absolutely accurate. Thus in the prior art relied on accuracy was not essentially sought. But in the field in which Cooper worked a variation of a fraction of a percent could make a difference of a very large amount of money lost in toll collections. Without accuracy as nearly absolute as possible in human affairs, there is no control over toll collections.

Also in devices of the type exemplified by the prior art there is no incentive to make the count inaccurate. In the prior art patents there was no need to prevent deliberate false counting or to prevent the possibility of false counting as an excuse for the appropriation of monies. These prior art devices function in the abstract. They give a result which is not measured in dollars and cents, which does not affect the payment of monies, and of which no pecuniary advantage could be taken by a toll collector or any one else.

Prior to Cooper's inventions, there seems to have been no reliable method of insuring an accurate count of the vehicles passing through toll collection stations. The problem became a pressing one particularly in connection with the traffic facilities be-

tween New York City and New Jersey and other points. This was fully testified to by the witness Geenens, (R. P. 1169 et seq.),

Mr. Geenens is an electrical engineer. At the time he testified, he was the electrical engineer for the Tri-Borough Bridge and Tunnel Authority and the Brooklyn-Battery Tunnel Project. He had also been with the New York Tunnel Authority for some ten years and with the Port of New York Authority where, for some five years he was the Superintendent of the George Washington Bridge. He also was Assistant Electrical Engineer and later Operating Engineer for the Holland Tunnel for about five years. He testified regarding the first method of collecting tolls at the Holland Tunnel and elsewhere and about its failure.

Mr. Geenens further testified that before he met Mr. Cooper in 1930 the Port of New York Authority appropriated $10,000 for investigating various methods of properly collecting and checking tolls in order to come to a decision as to what should be employed for checking toll collections on the George Washington Bridge. Mr. Geenens was assigned to make the investigation.

In his testimony, Mr. Geenens described many toll checking apparatuses which came to his attention, all of them, however, unsatisfactory for the purpose. He sent an assistant to Monroe Bridge in Rhode Island where a vehicle counting apparatus had been installed. He investigated a counting machine operated by means of a rubber hose lying across the roadway and filled with liquid. He tried a photo-electric method of counting in the Holland Tunnel as an experiment. This turned out to be wholly unsatisfactory. He got in touch with the Miller Train Control Co., manufacturers of a magnetic railway traffic signal. Mr. Miller and his son came to look into the problem. They felt that they could modify their control unit to count vehicles. This device proved to be worthless. A snow shovel passing in winter would operate the unit, while motorcycles and trailers would pass by without affecting it at all.

In 1930 Mr. Geenens met Mr. Benjamin Cooper, plaintiff herein. Mr. Cooper

graduated from Massachusetts Institute of Technology in 1923. Thereafter he worked as an engineer for General Electric Company and for Fiberloid Corporation. Later, he organized Taller and Cooper, manufacturers of toll checking equipment. He had had some previous experience with toll checking equipment in connection with the Ambassador Bridge in Detroit. The Ambassador Bridge had undergone financial reorganization and further experiments could not be conducted.

It was at this time (R. P. 1194, et seq.) that he contacted the New York Port Authority and visited Mr. Geenens. Mr. Cooper told Mr. Geenens about his experience and experiments with the three contact treadle, how it was substantially footproof or pedestrian-proof, and how the addition of another contact would provide means for checking traffic which practically would be fully safeguarded against pedestrians.

Mr. Geenens, in describing his conversation with Mr. Cooper, stated: (R. P. 1179) "We told him we did not have any success, and of course immediately the discussion turned to vehicle counting because we were then in the midst of our research, to find a means of counting. So he told us that he was working on counting and he proposed to make us an experimental unit which we would test, having four contacts, and spread a sufficient distant in such a way that unless a foot operation was entirely following the action of the tire, it would not work. So we accepted the idea that he should make one and we would test it, and we eventually did, and we installed it at the Goethals Bridge also."

This four contact treadle was found satisfactory and as a result the toll registering equipment embodying Cooper's inventions was installed at the George Washington Bridge and later at other traffic facilities under control of the Port of New York Authority.

The importance of safeguarding the tolls was affirmed by Mr. Ferguson, now President of the Hudson County National Bank of Jersey City, New Jersey, but formerly a Commissioner and Chairman of the Port Authority of New York.

Mr. Ferguson testified (R. P. 1187, et seq.): "Q. (By Mr. Kirschstein of Counsel for Plaintiff) During the time that you were Commissioner, what properties were under the Authority control? A. The Holland Tunnel, the Goethals Bridge, the Outerbride Crossing, the Bayonne Bridge, the George Washington Bridge, Lincoln Tunnel, the Inland Terminal Building at Eighth Avenue and 15th Street, the Grain Elevator in Brooklyn. I think that is about all.

"Q. In what manner was the construction of these facilities financed? A. By the sale of revenue bonds.

"Q. And were those bonds secured in any way? A. By a lien on the tolls.

"Q. Was the problem of safeguarding the tolls important? A. Yes.

"Q. What was the annual toll collection from the various properties, on an average? A. As I recall, about 18 millions of dollars, although that has gone up in the last couple of years from that figure. They are right at their peak now.

"Q. Do you recall whether or not, in connection with the George Washington Bridge, any particular assignment was given to the engineers in regard to laying out the toll checking equipment? A. Yes. We had been having a lot of trouble with small stealings by toll collectors, and the engineers and those in charge of traffic conditions reported that from time to time to the Commission, and a sum was appropriated to study and see if something could not be devised to relieve us of that condition.

"Q. Do you know what equipment for toll checking was eventually adopted by the Port Authority? A. Yes; we adopted this treadle system of recording the vehicles as they passed over the treadle.

"Q. What kind of treadle was it? A. Do you mean from whom did we buy it?

"Q. Yes. A. We bought it from Mr. Cooper's concern.

"Q. That is, Taller & Cooper? A. Yes, sir.

"Q. And is the Cooper you refer to, Mr. Benjamin Cooper, who is in court now? A. Yes, sir.

606

"Q. During the war, while you were still with the Port Authority, was this Cooper toll checking equipment used in any particular way in regard to the accounting for fares between the Port Authority and the Army and Navy? A. Yes; my understanding is that the Army and the Navy accepted the records shown by the toll equipment and paid their bills based on that record and did not have inspectors there to check the number of vehicles that passed through. * * *

"Q. Do you know about how much per year that toll collection that the Army and Navy had to pay came to? A. Well, I have an idea that it ran up into three hundred and fifty to four hundred thousand dollars at the peak—at that rate."

That Cooper's equipment filled a need and solved a problem and that in particular it overcame the important stumbling-block of false counts due to pedestrians was testified to by several witnesses.

Mr. Ryan, who is employed by the Public Works Department of the City of Boston, Mass., in charge of the maintenance and operation of the Sumner Tunnel, testified: (R. P. 640) that the Cooper equipment is in use there and that during the years millions of cars had passed through the tunnel. He further testified (R. P. 648) as follows:

"Q. Have you had any cases where a collector has attempted to explain any discrepancy between the amount he turns in and the treadle count by saying that some pedestrian must have walked over the treadle? A. They have tried it but it has not worked.

"Q. And is this foot-proofing, as we call it here, of the treadle an essential part of your checking system there? A. Well, I think it is the whole heart of the tunnel service itself."

Mr. Griffin, who is the business manager for the Hartford Bridge Commission, a division of the State of Connecticut and as such is in charge of the Charter Oak Bridge which crosses the Connecticut river, testified (R. P. 653-654) that the bridge was "financed from a bond issue;" that since its opening on Sept. 5, 1942, "the bridge has handled approximately 12 million vehicles"; that the toll-checking equipment used since January 1, 1943 is that manufactured by the Taller-Cooper Company; that "while pedestrians are not invited around a toll station, there are always breakdowns and vehicles stopping there, and frequently pedestrians would walk across the lanes," but that there has never "been any difficulties at the Charter Oak Bridge arising from differences in the toll amounts turned in by collectors and the tolls that should have been turned in in accordance with the treadle count."

(Defendants moved that all of the testimony of the witnesses Ryan and Griffin be stricken and disregarded. Decision on the motions was reserved. The motions are here and now overruled.)

Mr. Curtin is a "transportation engineer" who had worked on traffic problems for many years. He was "Engineer analyst for the Pennsylvania Turnpike." He made a thorough investigation for the Pennsylvania Turnpike Commission of toll-checking systems and apparatus and wrote a report thereon (Exhibit 15) and (R. P. 676) "made a specific recommendation for the Taller & Cooper installation" and "sent that report to the Commission." He testified that: "The toll collection facilities were a most significant part of the development of the project, for the reason that first of all the project is financed by revenue bonds, and the Commission did covenant with the bondholders to maintain an accurate daily record of the traffic using the project, the same as other toll facilities."

In his oral argument, counsel for defendants stated: "The difficulty is that this suit, involving validity and infringement of patents, and the solution of the toll collection difficulties, was met in the case of the patents in suit through expedients that, in the opinion of the defendants, do not rise to the dignity of invention over the prior art. Every slight change or advance does not constitute invention. Ohmer Fare Register Co. v. Ohmer, 238 F. 182, 186–187."

The Court is of the opinion, however, that the subject matter of the patents

in suit (and each of them) does display "invention", "more ingenuity * * * than the work of a mechanic skilled in the art" which has been held "to be an essential requirement for the validity of a patent." Sinclair & Carroll Co. v. Interchamical Corporation, 325, U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644.

■ As stated in E. I. Du Pont de Nemours & Co. v. Glidden Co., 2 Cir., 67 F.2d 392 at page 395, "invention is always a function of the particular situation, of the conditions which preceded and followed the appearance of the composition or the machine."

■ While the Court entertains no doubt as to "invention" its view in this respect is strengthened by the fact that, as already indicated, prior to Cooper there was no trustworthy toll equipment to satisfy the all important safeguarding of the tolls. That there existed a want and need for such an apparatus seems obvious from the record, and by the commercial success of the Cooper apparatus and its reception by the interested public.

The record shows that the apparatus containing the devices of the Cooper inventions of the patents in suit has met with great commercial success and that this success is due entirely to the merits of the inventions themselves, uninfluenced by any extraneous factors, such as advertising.

Practically every important traffic facility in the country employs the inventions of the patent in suit. Cooper's toll collecting equipment has been installed (R. P. 1196–1197) in the Holland Tunnel, the Sumner Tunnel and the Lincoln Tunnel; on the George Washington Bridge; the Tri-Borough Bridge; the Hendrick Hudson Bridge; the Marine Park Bridge; the Cross Bay Bridge; the Golden Gate Bridge; the Susquehanna Bridge; the Charter Oak Bridge; the New London Bridge; the Merritt Parkway and many other places.

In Recke-Nash v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, at page 886, the Court say "if we were to consider the question of invention a close one, the wide commercial success of the device and its adoption after thorough tests by experts strengthens the presumption of validity. Motor Improvements, Inc. v. General Motors Corporation, 6 Cir., 49 F.2d 543."

The foregoing quotation expresses the views of this Court in the instant case.

■ It is now axiomatic that a patent regularly issued is presumed to be valid. As stated by the Court in Merco Nordstrom Valve Co. v. W. M. Acker Organization, 6 Cir., 131 F.2d 277, 280. "Of course the patent itself was prima facie evidence of its validity."

■ ■ The burden of proving want of novelty is upon him who avers it. "Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.' Id. Cantrell v. Wallick, supra, [117 U.S. 689, 695, 696, 6 S.Ct. 970, 974, 29 L.Ed. 1017]; Coffin v. Ogden, 18 Wall. 120, 124, 21 L.Ed. 821; Barbed Wire Patent, 143 U.S., 275, 284, 285, 12 S.Ct. 443, 36 L.Ed. 154; Adamson v. Gilliland, 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356." Mumm v. Jacob E. Decker and Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

■ "One otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance." Williams Mfg. Co. v. United Shoe Mach. Corp., 6 Cir., 121 F.2d 273, 277, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537. The immediate acceptance of Cooper's equipment by substantially all of the important traffic Facilities and Authorities is in itself evidence of the recognition of Cooper's novel contribution.

Defendants charge that Cooper was not the inventor of the circuit patents in suit, and urge that this is particularly true as to the subject matter of the '627 or so-called "shorting" patent, claiming (while denying there is such) that if there be invention at all, it belongs to one Gerald V. Smith, who was formerly in the employ of Mr. Cooper and in charge of maintenance and installation of his toll equipment. Mr.

Smith was called as a witness on behalf of defendants, his testimony starting in the record at page 1333, and running through to page 1359. Defendants claim that Smith was corroborated by two other ex-employees of Mr. Cooper, Messrs. Thompson and Willey, who also testified (Record pages 1359-1380).

Defendants assert that while all patent applications were prepared in Mr. Cooper's name, that Smith worked out the solutions of the problems and that at no time did Mr. Cooper go over the disclosures. Defendants submit that "Mr. Cooper has evidently fallen into the error of so many heads of small businesses who feel compelled by need for personal glory or otherwise, to claim inventorship of all inventions originating among their employees." In connection with this contention of defendants the record shows, and it is admitted, that Smith was in plaintiff's employ and that he testified that any invention he might have made was the property of plaintiff. (R. P. 1397.)

Inasmuch as the patent application was filed by Cooper and the patent issued to Cooper, the presumption is that Cooper is the inventor and the burden to overcome this presumption by a fair preponderance of the evidence, is upon defendants. Procter & Gamble Co., v. Berlin Mills Co., 2 Cir., 256, F. 23. In that case, where a claim was asserted similar to the one here, the court, 256 F. at page 27, stated: "This is an affirmative defense, and must be sustained by a fair preponderance of credible evidence. * * * The presumption of validity extends to the identity of the inventor."

That burden, in view of the Court, has not been sustained by defendants in this case. Smith's statements in the presence of Mr. Cooper and others prior to the time of the Smith deposition, was that Cooper was the inventor. (R. P. 1397). As between employer and employee, the burden of proving originality is heavily upon the employee. Owens v. Sponable, 21 C.C.P.A., Patents, 992, 69 F. 2d at page 650.

As to this defense, the Court finds that Mr. Cooper himself was the true inventor of the inventions of the patents in suit.

In view of all the foregoing, the Court is of the opinion and so finds that the claims in issue of the respective patents in suit are each and all good and valid in law, and agrees with the conclusion of plaintiff that "the patents in suit are clearly for inventions of a high order."

## II. Infringement.

Defendants deny infringement. In their brief they say "the treadle patent and the key identifier patents are clearly not infringed and the court will have no difficulty in so finding * * * the circuit patents because of their complexity are slightly more troublesome at first glance, but when they are reviewed, it is soon evident that they too, are not infringed by defendants' circuit."

Re: Infringement of Patents Nos. 2,165,227, 2,166,090, 2,205,555 and 2,313,627.

Both in their brief and oral argument, defendants discuss in very considerable detail, the features of their structures (as exemplified in Exhibits 24 and 25, and explained in their answers to Interrogatories propounded by plaintiff before trial, R. PP 334 et seq.) alleged to infringe the claims in issue of patents in suit Nos. 2,165,227; 2,166,090; 2,205,555 and 2,313,627, pointing out the differences which they assert exist between their structures and those of the respective patents, as the result of which their structures do not respond to any of the claims in issue. These asserted distinctions were testified to also by Professor Ballard, defendants' expert. It would be impractical within the confines of this Decision even to attempt to set them all out. For present purposes sufficient reference to the equipment or apparatus of defendants is later made in Findings of Fact Nos. 49 to 63, inclusive.

The evidence in the instant case convincingly and conclusively shows that the structures or apparatus or devices of plaintiff as described and shown in patents in

suit Nos. 2,165,227; 2,166,090; 2,205,555 and 2,313,627 and the claims thereof here in issue and each of them and the alleged infringing structures or apparatus or devices of defendants are to all intents and purposes identical in the offices they perform and in the manner in which they perform them. Such variations as there are between them are wholly immaterial. At best they are merely colorable.

In E. H. Bardes Range & Foundry Co. v. American Engineering Co., 6 Cir., 109 F.2d 696, 698 at page 698 the Court say: "A close copy which seeks to use the substance of the invention, and although showing some change in form and position, uses substantially the same device, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed. 494. Even where the invention must be restricted in view of the prior art to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, there is infringement where the departure is merely colorable. Duff v. Sterling Pump Co., 107 U.S. 636, 639, 2 S.Ct. 487, 27 L.Ed. 517; Sanitary Refrigerator Co., v. Winters, 280 U.S. 30, 41, 50 S.Ct. 9, 74 L.Ed. 147."

The Court is of the opinion and so finds that the accused structures or apparatus or devices of defendants as exemplified by plaintiff's exhibits 24 and 25 herein, infringe patents in suit Nos. 2,165,227; 2,166,090; 2,205,555 and 2,313,627 and each of the claims here in issue of each of said patents, respectively.

### Re: Infringement of Patent No. 2,196,194.

As stated by defendants this Key-operated identifier patent is in a separate category from the other four here in suit. Defendants contend that they utilize quite a different type of Key-operated identifier from that shown and described in Patent No. 2,196,194 and in Claims 13 and 15 thereof, here in issue. They say: "Defendants' key identifier is shown in Exs. 27a, b and c. (In this connection see also Exhibits 26 and 28, R. PP 344 and 356 respectively.) As shown in Figure 3 of Ex. 27b, a key 23 is inserted in a keyway so that the notches on its upper edge cooperate with contact fingers 42 which lift contact strips 43 out of contact with the points 44. Where key notches occur the fingers fall down permitting the contacts 43 and 44 to close.

"Beneath the key is an eccentric roller 31 which can be rotated to push the key upwardly into contact with the fingers 42 and thus open the contacts 43 and 44. As the roller is rotated a cam at its outer edge causes a print to be made at 90° and a second identical print at 270° of rotation. Thus two identifying prints are made, the second before the key can be removed from the lock. (R. P. 737).

"It will be noted that the claim (13) calls for 'mechanism controlled by the withdrawal of the key from the key receiving means for printing a second time by means of said identifying element.' This second print in the patent is always a 00 print (R.P. 712). In defendants' structure no printing can take place unless the key is in the lock and there is no mechanism controlled by the withdrawal of the key to cause the printing mechanism to operate. Defendants' structure does not respond to the language of this claim. (13).

"Again the claim (15) concludes by saying 'and means controlled by withdrawal of the key from said identifier for automatically causing a second printing operation.' In the structure in the patent in suit there is such a means, a description of which is found at page five of the specification, column 1, lines 8 through 18. Defendant makes no use of such a mechanism, and accordingly avoids infringement of this claim (15) as well as of claim 13."

Plaintiff, on the other hand, submits that while "In defendants' construction the key is not in the actual process of being pulled out at the instant the second print is made, nevertheless, it has been freed for such removal by the rotation of the shaft 31; that this rotation is part and parcel of the act of withdrawing the key and no purpose is served by this rotation except as the preliminary and necessary step to the re-

moval of the key. Thus the defendants' second print is made as in plaintiff's device, during the act of withdrawing the key."

Plaintiff asserts that this is true both as to Claims 13 and 15 and that defendants "should not escape infringement merely because they condition the key for removal when making the record print, instead of making the record print when the key is being pulled out."

Again with regard to this patent, as with the others, sufficient reference as to infringement is made in Findings of Fact Nos. 64 to 75, inclusive.·

Upon the evidence adduced the Court is of the opinion and so finds that the mechanism or device of defendants, as exemplified by plaintiff's Exhibit 26, and described (after certain corrections as shown in the record) in plaintiff's· Exhibit 28, does not infringe the ·claims in issue or either of them of patent No. 2,196,194.

III.

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the Court has arrived at the following:

Findings of Fact.

1. Plaintiff is a resident of the State of New Jersey.

2. Defendants, Westchester County and Westchester Cross County Parkway Authority are duly constituted corporate bodies domiciled in the State of New York.

3. Automatic Signal Division of Eastern Industries, Inc., (sometimes hereinafter referred to as "Automatic Signal"), openly conducted the defense of these actions.

4. Plaintiff is the owner of United States Letters Patents No. 2,165,227, dated July 11, 1939, No. 2,166,090, dated July 11, 1939, No. 2,205,555, dated June 25, 1940, No. 2,313,627, dated March 9, 1943 and No. 2,196,194, dated April 9, 1940.

5. Defendants Westchester County and Westchester Cross County Parkway Authority maintain and operate equipment charged by plaintiff to infringe claims 10, 27 and 28 of Patent No. 2,165,227; Claims 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of Patent No. 2,166,090; claim 1 of Patent No. 2,205,555; claims 1, 5, 7 and 14 of Patent No. 2,313,627 and claims 13 and 15 of Patent No. 2,196,194.

6. Automatic Signal Division of Eastern Industries, Inc., manufactured and sold such equipment to defendants Westchester County and Westchester Cross County Parkway Authority.

7. The patents in suit relate to toll registering equipment used on traffic facilities like bridges, highways and tunnels.

8. In recent years, vehicular traffic has grown to hugh proportions, and to accommodate it, many costly traffic facilities have been built. These have been financed by bonds secured by tolls. The tolls thus collected entailed very large sums of money.

9. Prior to the patents in suit, tolls had been pilfered or lost through carelessness or otherwise, because an accurate count of the toll-paying vehicles could not be made, and collectors, therefore, could not be held strictly accountable.

10. Prior to the patents in suit, many types of counting devices had been tried or considered as toll counters but were found to be inaccurate and impractical. Such devices included cash register and ticket systems, road boards, liquid filled hoses, photo-electric counting systems, magnetic counters and single and double switch treadles. These devices were ineffective for such reasons as: their ability to be falsified, interference by snow and ice, difficulty of installation, improper operation by trailers, unwanted operation by passage of nearby traffic, and unwanted operation by casual pedestrians.

11. Many of these devices were investigated by Mr. Geenens of the Port of New York Authority who conducted an investigation for that body in order to procure a practical and accurate toll registering system for the George Washington Bridge.

12. Mr. Curtin made a similar investigation for the Pennsylvania Turnpike Commission and he, too, found such devices as are referred to in Finding No. 10, unsatisfactory.

13. As a result of his investigation, Mr. Geenens selected Taller & Cooper's equipment embodying the patents in suit for the George Washington Bridge. Mr. Curtin as a result of his investigation recommended the same kind of equipment to the Pennsylvania Turnpike Commission.

14. Toll registering equipment embodying the devices of the patents in suit, has been installed in a great number of important facilities. Such equipment has counted a vast number of cars and their tallies have recorded the vast numbers of cars using the traffic facilities. Payments of large sums of money have been made based solely on the accuracy of such count.

15. Mr. Cooper, plaintiff herein, the inventor in all the patents in suit, graduated from Massachusetts Institute of Technology in 1923 and has had considerable practical experience in electrical and mechanical matters. Taller and Cooper manufactured toll checking equipment covered by the patents in suit.

16. Cooper succeeds in counting accurately where previous toll registering devices fail, by using a treadle having three or more switches equally spaced less than 3 inches apart, whereby a wheel rolling over the treadle will close the switches in sequence and will close adjacent switches concurrently in overlapping relationship, but a casual pedestrian will be extremely unlikely to effect such operation. The degree of concurrency (overlapping) of the switches is unimportant. Overlapping of any number of switches, from two up, suffices to characterize the passage of a rolling wheel and to distinguish it from a pedestrian. Cooper connected the treadle switches to an electrically controlled counter through a circuit which was such that the counter would be actuated only if the switches were closed in the fashion (sequentially and with overlap) caused by a wheel rolling over them.

17. Patent No. 2,165,227 ("Switch") is for a treadle. Claims 27 and 28 set forth the critical least number of switches and the spacing as described in Finding No. 16. Such spacing and number of switches is the novel feature in these claims. Claim 10 describes a multiple switch treadle in which treadle housing is made of a compressible material and has grooves on its upper surface between the switch units. This assures independent operation of the individual switch units.

18. Patent No. 2,166,090 (Treadle Controlled System) is for the combination of the counter, the treadle with the special number of specially spaced switches, and the circuit which is constructed to operate the counter only when the treadle is operated by a wheel rolling thereover. All the claims in suit of this patent (No. 2,166,090) describe the combination of counter, treadle and switch, which are effective to make a count only when a wheel traverses the treadle in a certain direction.

19. Patent No. 2,166,090 additionally describes other features which make plaintiff's (alleged) "system" more effective. Typical of these are the following: (a) The rollback feature included in claims 7, 8, 10, 11 and 12 which prevents making of additional counts if a wheel moves back and forth on the treadle without completely crossing over the treadle. (b) The feature of insuring completion of a count even when a vehicle rolls over the treadle more rapidly than the counter can count. This feature is integrated with the feature of automatically de-energizing the counter once it has been electrically energized. One or both of these features are in claims 5, 6, 7, 8, 9, 10 and 12. (c) Another feature (found in claims 4, 8 and 9) is the means to prevent making of a count to record passage of a vehicle in a certain direction when the vehicle crosses the treadle in an opposite direction.

20. Patent No. 2,205,555 (Treadle Circuit) shows two counters connected to a multi-switch treadle by a circuit which will cause one of the counters to operate if a wheel crosses the treadle in one direction and the other counter to operate if the wheel crosses the treadle in the opposite direction. This patent has only a single claim covering the combination of the treadle, the two counters, and the special circuit for operating one or other of the counters depending upon the direction of traversal of the treadle. The new combination of this patent obviated any excuse

based on a claim that a count was inaccurate because a car backed across a treadle and therefore crossed it twice in a forward direction.

21. Attempts sometimes were made to falsify the recorded count by shorting or closing one or more of the treadle switches so as to prevent a count from being made for each paying vehicle which crossed the treadle while a switch was shorted or held closed.

22. Patent No. 2,313,627 (Treadle Controlled Toll Checking System) prevented the defection referred to in Finding No. 21, by providing a combination including two counters, a treadle and a circuit, wherein the circuit included provision for making a proper forward and backward count even when any switch was shorted prior to and during the time a wheel traversed the treadle in either direction.

23. Patent No. 2,196,194 (Key Operated Identifier) is for a key identifier. The patent shows, and claims in claims 13 and 15, a mechanism which makes an identifying print characteristic of some collector when the collector's key is placed in a key receiving means and automatically makes a second print before the collector can leave the booth with his key in his possession.

24. None of the prior art patents relates to the field of toll registry to which the patents in suit relate.

25. None of the prior art patents is essentially concerned with obtaining an absolutely accurate count.

26. None of the prior art patents treats with the problem of safeguarding toll counts.

27. Those prior art patents which do deal with counting, deal only with counting of such character and object as to which there is no incentive to manipulate the result to cause monetary gain to a person.

28. Prior art patent to Weaver, 1,487,-771 shows three two-switch devices. Each set of two switches actuated concurrently, but not necessarily sequentially, will operate a different electrical device. There is nothing in the Weaver patent to indicate that the switches are spaced apart less

than three inches. No dimensions are given for any of the spaces between the switches.

29. The evidence is insufficient to demonstrate that Weaver did anything more than "test out" the mechanism shown in patent 1,487,771. The mechanism Weaver allegedly built was used solely as a private experiment and thereafter apparently was abandoned. There is no evidence that it ever was used publicly.

30. Prior art patent to Morris, 1,725,963 has only a single switch and therefore cannot, and does not, disclose grooves between adjacent switches, nor four switches spaced less than three inches apart.

31. Prior art patent to Geer 2,077,924 shows only two switches, so that it is not foot-proof. No dimensions are given as to the spacing of the switches.

32. Prior art patents to Wilcox 1,928,-472 and Geer 1,950,490 show single switches only, and fail to meet the multi-switch concept of plaintiff's circuit and treadle patents.

33. Prior art patent to Dixon 543,597 does not show a counter. Its circuit illustrates only two switches, so that it is not foot-proof. It has no elongated roadway treadle. It does not insure full operation of the counter, if there should be one, upon too rapid passage of a car and it does not automatically de-energize any counter.

34. Prior art patent to Grondahl 1,792,-835 has neither treadle nor counter. Its signal is energized upon the actuation of two switches only, regardless of the number of switches shown. The Grondahl switches are not spaced apart uniformly less than three (3) inches. Grondahl has no rollback feature and no automatic de-energization of a counter.

35. Prior art patent to Hershey 1,810,-211 has no elongated roadway treadle. It shows only two switches, so that it cannot be foot-proof. It does not provide for rollback, nor means for insuring energization upon too rapid passage of a vehicle over the switches.

36. Prior art patent to Gibbs 2,046,157 has only two switches and therefore lacks foot-proofing. It shows no elongated road-

way treadle, nor any means for insuring energization of a counter upon the too fast passage of a car over the switches. Gibbs does not have a rollback feature.

37. Prior art patent to Marston 2,048,-192 is not for counting wheeled vehicles. It does not have an elongated treadle embedded in a roadway, and with three or more switches spaced less than 3 inches apart for recognizing passage of a rolling wheel. It does not have means for insuring actuation of the counter regardless how fast the boards shown in this patent move past the switches.

38. Prior art patent to Vereinigte (British) 373,646 shows a patent which, although having more than two switches, is such that upon operation of only two selected switches the counter will be actuated, so that it is not foot-proof. There is no disclosure that the switches are spaced apart uniformly less than 3 inches. This patent uses different switches to obtain a forward count from those to obtain a backward count.

39. Prior art patent to Carlisle (British) 232,340 although showing several switches, can be operated by only two switches and therefore is not foot-proof. Carlisle does not require operation of all switches for counting in either direction and discloses no elongated treadle in a roadway. Its purpose is to count people, not automobiles.

40. Prior art patent to Knistrom 1,253,-051 discloses a mechanism in which a key is inserted into a cylinder and turned to open a lock and in so doing a print is made. The key then may be removed while the lock still is open without making a second print. The structure of this patent could not be used for the purpose of plaintiff's key identifier, patent 2,196,194, in suit.

41. Prior art patent to Larrabee 1,357,-715 is substantially the same as Knistrom 1,253,051 in that its key can be removed after unlocking without obtaining a second print.

42. Prior art patent to Ohmer 1,258,-803 does not provide a mechanism having an element such as described in Claims 13 and 15 of plaintiff's key identifier patent which is variably positioned in accordance with the shape of a key to print an identification of the key.

43. Neither Knistrom, nor Larrabee, nor Ohmer, (Findings Nos. 40, 41 and 42 respectively) had the same concept as Cooper, nor do their respective patents disclose a structure which would accomplish the results sought by Cooper.

44. Prior art patent to Katz 1,466,448 discloses no provision for making any print whatsoever.

45. Cooper invented the subject matter of patent No. 2,313,627 (the "shorting" patent) in 1939, prior to the filing date of Barker 2,311,359.

46. Prior art patent to Barker 2,311,359 was filed after Cooper had completed the invention of his "shorting" patent.

47. Gerald V. Smith did not invent the subject matter of patent No. 2,313,627, nor of any of the other patents in suit.

48. Defendants offered no prior art patents in which normal counting could be effected when a switch was shorted and held shorted during passage of a car.

49. Defendants' structure comprises a treadle (shown in plaintiff's Exhibit 24) connected by a circuit (shown in plaintiff's Exhibit 25) to forward and rearward counters. Defendants' key identifier is shown in plaintiff's Exhibits 27a, 27b and 27c and in part in plaintiff's Exhibit 26.

50. Defendants' treadle has an elongated housing made of rubber and is embedded in the top of a roadway in position to be traversed by vehicle wheels. Defendants' treadle has four switch units in the housing. Each unit comprises an upper contact and a lower contact, all the lower contacts being common. The upper surface of the treadle housing has a groove between each pair of switch units.

51. A common lower contact is the equivalent of several separate lower contacts.

52. Defendants' treadle has its four switch units uniformly spaced less than 3 inches apart. The units are co-extensive, side-by-side, and in substantially the same plane.

53. In defendants' treadle, the rubber housing is bonded to the upper contacts of the switch units so that the housing biases the two contacts of each switch unit apart.

54. Defendants' treadle is specially designed for use with the circuit (plaintiff's Exhibit 25) for toll registering.

55. Defendants' apparatus and circuit will register a county only on the proper forward or backward counter when the four switches of defendants' treadle are closed in sequence and with adjacent switches closed concurrently. Under these conditions, the forward counter only will register when a wheel traverses the treadle in a forward direction and only the backward counter will register when a vehicle wheel traverses the treadle in a rearward direction.

56. Defendants' apparatus and circuit requires a greater minimum degree of concurrency of actuation of the switch units than the minimum needed in plaintiff's circuit patents. The circuit patents can secure proper counts with the same degree of concurrency as the minimum required to operate defendants' circuit. All of the circuit patents and the defendants' circuit will operate properly with a greater degree of concurrency than the minimum required to operate defendants' circuit. Defendants' circuit in requiring a greater minimum degree of concurrency of operation than the minimum needed in plaintiff's circuit patents, may be a slight improvement over plaintiff's patents but it is essentially the same circuit.

57. Defendants' circuit will not cause a count to be made unless all of the treadle switches are operated sequentially and concurrently in a forward or reverse direction.

58. Defendants' apparatus and circuit has the rollback feature as it will not make additional counts if a wheel moves back and forth on the treadle without releasing two endmost switches.

59. Defendants' apparatus and circuit will ensure actuation of the counter even when a vehicle rolls over the treadle more rapidly than the counter can count.

60. Defendants' apparatus and circuit will automatically de-energize the counter after it has been electrically energized.

61. Defendants' apparatus and circuit will not make a count on the forward counter when the treadle is traversed by a rearwardly crossing wheel and vice versa.

62. Defendants' apparatus and circuit will make a count on the proper forward or backward counter corresponding to the directional crossing of a vehicle wheel over the treadle upon sequential and concurrent operation of the same switches in either direction.

63. Defendants' apparatus and circuit will make a count on the proper counter corresponding to the directional crossing of a vehicle wheel over the treadle even if any one of the four switches is shorted before and during crossing of the wheel.

64. The device of Patent No. 2,196,194 is a key identifier in which a special notched key is inserted in a lock and the active insertion engages a winding device of an electric pulser housed within the lock.

65. Subsequent rotation of the key releases the pulser which cooperating with electromagnets sets up a series of numbers on printing wheels.

66. As the key continues to be rotated, a printing magnet is operated near the limit of key rotation and the printing tape is pressed against the printing wheels and a record made.

67. Varying locations of key notches will wind the pulser different amounts and thus produce a separate number or series of numbers on the printing tape for each key.

68. Upon completion of the first print the printing wheels of plaintiff's patented identifier automatically return to zero and turning the key back has no effect on printing. Withdrawal of the key causes a zero print on the tape.

69. Defendants' key identifier gives two identifying prints by means of a separate control handle without rotating the key in the lock mechanism.

70. Defendants' device does not utilize a pulser.

71. In defendants' device, the first print is made in the first half turn of the control handle and the second is made by a further half turn of the handle in the same direction prior to the withdrawal of the key.

72. Claim 13 of plaintiff's identifier patent calls for a structure including "mechanism controlled by withdrawal of the key from the key receiving means for printing a second time."

73. Defendants' structure has no mechanism controlled by the withdrawal of the key for printing a second time and unless defendants' key is at all times in place in its identifier, no printing can take place.

74. Claim 15 calls for a structure including "means controlled by withdrawal of the key from said identifier for automatically causing a second printing."

75. Defendants' identifier has no means controlled by the withdrawal of the key for automatically causing a second printing operation but must at all times maintain its key in position if any print is to be made.

76. Defendants do not infringe claims 13 and 15 of patent No. 2,196,194 or either of them.

Conclusions of Law.

1. Plaintiff herein, Benjamin Cooper, is the owner of U. S. patents Nos. 2,165,227; 2,205,555; 2,313,627; 2,166,090; and 2,-196,194.

2. Plaintiff herein, Benjamin Cooper, is the first, original and sole inventor of the inventions described in U. S. patents Nos. 2,165,227; 2,166,090; 2,205,555; 2,-313,627 and 2,196,194.

3. Claims 10, 27 and 28 of patent No. 2,165,227; claims 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of patent No. 2,166,090; the single claim of patent No. 2,205,555; claims 1, 5, 7 and 14 of patent No. 2,313,627 and claims 13 and 15 of patent No. 2,196,194 all and each are good and valid in law.

4. Defendants have infringed claims 10, 27 and 28 of patent No. 2,165,227; claims 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of patent No. 2,166,090; the single claim of patent No. 2,205,555; and claims 1, 5, 7 and 14 of patent No. 2,313,627 and each of them.

5. Defendants do not infringe claims 13 and 15 of patent No. 2,196,194, or either of them.

6. The decree in these cases shall be binding as to validity and infringement and in all other respects upon Automatic Signal Corporation, now a Division of the Eastern Industries, Inc., who assumed the defense of these suits.

7. On notice counsel will submit an appropriate judgment and decree to be entered (in each of the two cases respectively) in favor of plaintiff and against the defendants, granting an injunction and an accounting for damages and profits, except as to patent in suit No. 2,196,194.

8. Costs are to be taxed against defendants.